**John Roger HUMPHREYS, Plaintiff in Error,**

v.

**STATE of Tennessee, Defendant in Error.**

Court of Criminal Appeals of Tennessee.

Aug. 29, 1975.

Certiorari Denied by Supreme Court Nov. 3, 1975.

W. Stanley Yarbro, Johnson City, H. Dennis Erwin, Erwin, for plaintiff in error.

R. A. Ashley, Jr., Atty. Gen., Bart Durham, Asst. Atty. Gen., Nashville, Lewis May, Dist. Atty. Gen., Mountain City, Martha Sherrod, Asst. Dist. Atty. Gen., Richard Pectol, Sp. Prosecutor, Johnson City, for defendant in error.

## OPINION

DUNCAN, Judge.

The defendant, John Roger Humphreys, was indicted by the Washington County Grand Jury on two (2) charges of first degree murder, involving the deaths of John Roger Scholl and Susan Garrett Humphreys. The two (2) indictments were tried together, with the result that the defendant was found guilty of second degree murder in each case. He was sentenced to the penitentiary in each case for not less than ten (10) years nor more than twenty (20) years, the sentences to be served consecutively. The defendant has duly perfected his appeal to this Court.

In his first assignment of error, the defendant attacks the sufficiency of the evidence.

This rather extensive record, consisting of several volumes, reflects that the defendant and the deceased, Susan Garrett Humphreys, were married in May, 1965, while both were in high school. A child, Angela, was born to this union on November 17, 1966. In the fall of 1971, the defendant and Susan became involved with the deceased, John Roger Scholl, and his wife, Diane Scholl. According to the defendant, Susan and Scholl became enamoured with each other, and they (Susan and Scholl) sought to arrange a wife swapping affair involving the two (2) couples. The defendant testified that he, at first agreed, in order to please Susan, but later backed out. It is noted that there was no other proof regarding the alleged wife swapping affair except the defendant's testimony. The defendant stated that Susan made several trips to visit the Scholls after the Scholls had moved to the State of Maryland. The defendant insisted that Susan had participated in other immoral affairs, and admitted that he, himself, had dated other women during their marriage.

We find it unnecessary to explore in great detail the marital difficulties that these parties experienced. Suffice to say that the record supports the conclusion that both the defendant and Susan were involved in extra-marital relationships, and in particular, Susan had established a relationship with Scholl, the end result of their difficulties being that Susan obtained an

uncontested divorce from the defendant on April 16, 1973.

From the proof in the record, we find that on May 11, 1973, the two (2) victims, Susan and Scholl, were in her apartment. The defendant entered the apartment around 11:30 a. m. and around 1:45 p. m. shots were heard by several witnesses. The defendant was observed leaving, and thereafter Susan and Scholl were found dead. Susan had been shot twelve (12) times, with five (5) of the bullets entering her back, and Scholl had been shot six (6) times. It is undisputed that the shots were fired from a two-shot "derringer," which would have required re-loading eight (8) times.

The state offered numerous witnesses who testified in substance that the defendant, both immediately before and after the shooting behaved in a normal manner, several stating that he looked and acted then the same as he appeared on the days of the trial. There was proof that he passed a friendly greeting to a friend as he entered the apartment. Further, it was shown that he appeared calm as he walked out of the apartment and that he drove his car away from the scene in an unhurried manner and without difficulty.

The police officers, who were involved in the arrest of the defendant soon after the difficulty, and those who saw him at the police station later that afternoon, all stated that the defendant did not appear to be nervous or upset, and that they were able to communicate with him without difficulty.

Other witnesses for the state testified as follows:

Mark Slagle testified that he knew the defendant and saw him enter Susan's apartment; that he called out a greeting to the defendant, who smiled and "walked on towards the apartment"; that the defendant was carrying a "vodka bottle"; that the defendant appeared to him to be a "normal functional human being" at that time; that in April, 1973, the defendant had said to

him regarding Susan, "Well, if I can't get her back I'll kill her."

Mrs. Louise Garrett, mother of Susan, testified and said she had known the defendant for eight years; that in her opinion, he "definitely knew right from wrong" and was "a perfectly normal boy." Susan's brother, Robert Garrett, testified in substance to the same thing.

Reeves Zimmerman testified he had known the defendant for three (3) years, and that shortly before the killing, the defendant told him he guessed he'd have to kill Susan, if they could not get back together. This witness further stated that the defendant was a normal functional human being and knew right from wrong.

Freddie Rowe testified he had known the defendant for five (5) years and that it was his opinion that the defendant knew right from wrong, and that the defendant "seemed in control" of himself on all occasions that he had seen him.

In his testimony the defendant testified that on the date in question he arose at approximately 7:30 a. m. and went to the post office to pick up his company's mail, and then drove by the university library to ask Susan for a date; that he discovered her car was not in her regular parking place, whereupon he proceeded to his place of employment where he remained a short time; that he then went to the bank and ultimately went to Susan's apartment, arriving there at approximately 10:00 a. m.; that Susan, wearing a blue see-through nightgown, admitted him, and he then observed Scholl, in the nude, entering the bathroom; that at Susan's request, he left and returned to work; that at approximately 11:00 a. m. Susan called him and invited him to return to the apartment, which he did, bringing a bottle of vodka with him; that upon arriving there he asked Susan what was going on, and she replied, "It's obvious we are having an affair"; that Susan and Scholl wanted to make sure he would not tell anyone what was going on and they also wanted some money so they

could go to Asheville for the weekend; that he had some breakfast, and a drink; that further words were had over the defendant's intention to call Scholl's wife; that Scholl said it would be unfortunate if he did, and the defendant replied that "it would be unfortunate" for Scholl; that after about thirty (30) minutes, Susan left the room and he and Scholl talked about their difficulties over Susan; that he (defendant) then got up and left the kitchen in about twenty (20) minutes and went to the bathroom; that at this time, Susan "handed" him "the derringer and a box of cartridges", which he had theretofore given to her for her protection; that he then joined Susan on the couch in the living room and sat down beside her; that he professed his love to Susan, but was rejected by her; that Scholl was yelling things out of the kitchen, "quoting Shakespeare"; that he and Susan returned to the kitchen, and after further argument over the money, Susan called him "Peter Pan" and said he was "sexually frustrated"; that Scholl, who had been sitting on the kitchen counter, "jumped off the counter" on top of him; that "it was just like an automobile crash," and he "didn't hear anything"; that the next thing he knew he "was walking out of the apartment and it seemed to be dark and foggy outside"; that he got in his car, picked up a girl friend, Leslie Tipton, went to his house, had some wine, and realized that he "had a gun" in his pocket and "walked out in the back yard and dropped it"; that he ate "part of a hamburger" and then the police came. The defendant then related in some detail the events that transpired after the police came. The defendant concluded his testimony on cross-examination by stating that from the evidence, he did not guess there was any doubt but that he had killed Susan and Scholl.

From the defendant's testimony in the record, it appears rather conclusively that he remembers in minute detail, the events leading up to the difficulty and those events that transpired subsequent to his leaving the scene of the homicides. It is only at the actual time of the shooting that he says he has no recall.

The defendant, in support of his plea of insanity at the time of the killings, offered as witnesses Dr. J. J. Embry, a psychiatrist and Dr. John Kandilakis, a psychologist. Both testified that in their opinion the defendant was in such a mental condition, at the time of the events complained of herein, that he could not differentiate between right and wrong.

Both doctors examined the defendant some several months after the killings. Dr. Embry initially examined the defendant on August 31, 1973, and had the defendant committed to the hospital on September 4, 1973, where he conducted other tests between then and September 16, 1973. Dr. Kandilakis conducted tests on the defendant, at Dr. Embry's request, on September 7, 1973.

Dr. Embry stated that he saw the defendant for seventeen and one-half (17½) hours of interviewing of which two and one-half (2½) hours were devoted to a "sodium amytal interview," which he described as a procedure to help one remember things which one otherwise could not recall.

Dr. Embry stated that in his first interview with the defendant, the defendant stated that he "could not remember the events of this homicide."

Three witnesses, Charles Gordon, Charles Smith, and William Durby, testified that prior to these events the defendant was depressed and emotionally upset over his marital difficulties. Further, the first two named witnesses stated that they had heard the defendant threaten to kill himself.

■ The thrust of the defendant's argument under this assignment seems to be that since two doctors testified that he did not know right from wrong at the time of the incidents, then his convictions should not be sustained. We do not think this to be the law.

We think the case of *Brooks v. State*, Tenn.Cr.App., 489 S.W.2d 70, 73–74 (1972)

adequately states the law in regard to this question. There this Court stated:

"The defendant's lifelong conduct of compliance with the laws of society, his successful achievement of a substantial education and civil service employment, his lack of previous mental medical history, his rational conduct immediately before and shortly after arriving at the restaurant, his ability to locate the razor in a tool box in the trunk of his car, his recollection of the water being thrown in his face, his prompt willingness to submit to superior force when confronted with the policeman's pistol, and his psychiatric history since the events, are all items of evidence that were available for the jury's consideration, along with opinions of the psychiatrists regarding his insanity. In view of the total picture presented by all of the evidence, we are unable to conclude that the jury arbitrarily disregarded the doctors' opinions, or that the evidence of insanity preponderated against that of sanity."

Our Supreme Court in *Mullendore v. State*, 183 Tenn. 53, 60, 191 S.W.2d 149, 151 (1945), held that the actions of a defendant before and immediately after a homicide justified the jury in disbelieving the psychiatrist's testimony that the defendant was insane. The court went on to say:

"The undisputed words and acts of the defendant immediately before, at, and immediately after the killings, are the best evidence of whether he was or was not of rational mind at the time of the crime."

This record shows that the defendant was reasonably well educated with two (2) years of college, had a successful record of employment, and had no history of any mental problems, other than those emotional problems, that often arise out of marital difficulties. He told two (2) people that he would have to kill Susan, calmly went to her apartment where he knew she would be with Scholl and proceeded to kill them. The fact that the murder weapon was fired eighteen times, being reloaded after each two-shot series, shows in itself that the defendant was exercising mental discretion at the time. The evidence showed that the defendant left the apartment and drove his vehicle in a normal manner, picked up a girl friend, drove home, ate some food, had drinks, and hid the murder weapon in the back yard. He was able to communicate with the police in an intelligent manner.

Even if it were conceded to be a fact that the defendant could not remember the details of the crimes, still that would not avail the defendant's cause.

In *Thomas v. State*, 201 Tenn. 645, 653, 301 S.W.2d 358, 361 (1957), the Supreme Court, in an opinion by Chief Justice Neil, said:

" . . . Failure to remember later, when accused, is in itself no proof of the mental condition when crime was performed. . . .

" . . . amnesia, in and of itself, is no defense to a criminal charge unless it is shown by competent evidence that the accused 'did not know the nature and quality of his action and that it was wrong.' "

See also *Lester v. State*, 212 Tenn. 338, 370 S.W.2d 405 (1963), for the same proposition.

It was the function of the jury to decide the issue of sanity or insanity in this case. We think the evidence amply supports the jury's conclusion that the defendant was sane at the time of the acts in question and the record supports his conviction for second degree murder in each case.

Malice is an essential ingredient of murder in the second degree, and every homicide is presumed to be malicious in the absence of circumstances rebutting this implied presumption. *Harper v. State*, 206 Tenn. 509, 334 S.W.2d 933 (1960). Killing with a deadly weapon raises a presumption of malice sufficient to justify a finding of murder in the second degree, in the absence of facts and circumstances rebutting that

presumption. Malice may be either express or implied. *Bailey v. State*, Tenn.Cr.App., 479 S.W.2d 829 (1972).

Express malice was defined in *Warren v. State*, 44 Tenn. 130, 135 (1867), as being "where one, with a sedate and deliberate mind, and formed design, kills another; which formed design is evidenced by external circumstances discovering the inward intention—as lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm." The case further says, "malice is implied, when the act is committed deliberately, and is likely to be attended with dangerous consequences." See also *Turner v. State*, 119 Tenn. 663, 108 S.W. 1139 (1907).

Malice is an evil design in general, the dictates of a wicked and depraved and malignant heart. Malice is not necessarily confined to an intention to take the life of the deceased, but includes an intention to do any unlawful act which may probably result in depriving the party of life. *Bailey v. State*, supra.

When we apply the foregoing principles of law to the facts of this case, as set forth heretofore, there is no room for doubt that the evidence amply supports, at the very least, a conviction for second degree murder in each of these homicides.

In considering and passing on assignments of error challenging the sufficiency of the evidence to warrant and sustain the verdict of the jury in criminal cases, we are bound by the law that a guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the theory of the state. Such a verdict removes the presumption of the innocence of the accused which stands as a witness for him until he is convicted, and raises a presumption of his guilt upon appeal, and he has the burden upon appeal of showing that the evidence preponderates against the verdict and in favor of his innocence. *Gulley v. State*, 219 Tenn. 114, 407 S.W.2d 186 (1965); *Jamison v. State*, 220 Tenn. 280, 416 S.W.2d 768 (1966); *Chadwick v. State*, 1 Tenn.Cr.App. 72, 429 S.W.2d 135 (1968).

The evidence in this case does not preponderate against the verdicts. The assignment on the evidence is overruled.

In his second assignment the defendant contends that the verdict of the jury and the judgment of the court based thereon is contrary to law. It is his insistence under this assignment that these two offenses were parts of a single continuing act, inspired by the same criminal intent, and as such were susceptible to but one punishment.

We find this position to be untenable. In this case we are dealing with separate acts motivated by separate intents. The killing of Susan was a separate offense from the killing of Scholl.

In *Smith v. State*, 159 Tenn. 674, 681–682, 21 S.W.2d 400, 402 (1929), the court said:

> "It is well settled that, if a person kills or injures two persons at the same time, but with separate blows or separate shots, he may be prosecuted and convicted for the assault committed upon each of his victims."

This is so because such an assault upon or the killing of each individual is a separate and distinct offense. In *State v. Cook*, Tenn.Cr.App., 479 S.W.2d 823, 828 (1972), we said:

> ". . . Surely it is not the law that one who feloniously kills two or more persons during an altercation or in the commission of a felony, or by poison or by ambush, can only be convicted and punished for killing one of them.

> "In *Morgan v. State*, 220 Tenn. 247, 415 S.W.2d 879, our Supreme Court held that the two defendants who at the same time and place robbed three women who were living together and who jointly owned the money were properly prosecuted separately for the robbery of each of the women."

In the case of *Wilkerson v. State*, 211 Tenn. 32, 36, 362 S.W.2d 253, 255 (1962), this Court approved the following principles:

"Where accused robbed two or more persons at the same time the prosecution for one of the robberies does not prevent a subsequent prosecution for another." Citing 22 C.J.S. Criminal Law § 298, at page 788.

"A putting in jeopardy for one act is no bar to a prosecution for a separate and distinct act merely because they are so closely connected in point of time that it is impossible to separate the evidence relating to them on the trial for the one of them first had." Citing 15 Am.Jur. Criminal Law, § 390, at page 65.

In *Simmons v. State*, Tenn.Cr.App., 483 S.W.2d 590, 593–594 (1972), the court dealt with the problem of multiple convictions growing out of a continuous shooting episode. In an opinion by Judge Charles O'Brien, a member of the present panel, in approving such convictions, said:

"In this instance while the various victims were injured in what might have been categorized as one continuous transaction, they required separate actions, successive discharges of the firearm at the several individuals injured. The proof of the injury or death of any one would not have served to sustain a conviction for the separate injury or death to any one of the others. It very simply constituted separate offenses for which each of the several indictments, trials and convictions are justified."

In addition to the holdings of our own Courts referred to above, the defendant's insistence that the killings of the two (2) individuals herein constituted only one offense which he could be punished was rejected by the United States Supreme Court in *Ciucci v. Illinois*, 356 U.S. 571, 78 S.Ct. 839, 2 L.Ed.2d 983 (1958). In *Ciucci* the Court held the defendant's constitutional right of due process was not infringed by being tried in three successive trials for the murder of his wife and two of his children committed at the same time.

The defendant cites as authority the case of *Acres v. State*, Tenn.Sup.Ct., 484 S.W.2d 534 (1972). In that case it was held that there could not be a conviction for robbery and also a conviction for murder of the robbery victim. There the court proceeded upon the theory that the two (2) offenses were inseparable, committed at the same time and were part of a single continuing act inspired by the same criminal intent. In our case, sub judice, we are dealing with separate victims and separate intents. Moreover, we note that in *State v. John Edward Black*, Tenn.Sup.Ct., 524 S.W.2d 913 (1975) (opinion released June 16, 1975), our Supreme Court critically analyzed the *Acres* case, and while not expressly overruling same, stated it should be limited to its particular facts. In considering our case at hand it is pertinent to note that in the *Black* case, the defendant robbed the victim and then shot him in the leg. The Supreme Court approved his convictions for robbery as well as for an assault with intent to commit murder in the second degree.

The other authority cited by defendant is *Wells v. State*, Tenn.Cr.App., 509 S.W.2d 520 (1973), aff'd, Tenn.Sup.Ct., 517 S.W.2d 755 (1974). This case only stands for the proposition that where multiple drugs come into a defendant's possession at the same time, such is a single possession and separate convictions cannot be had for the different types of drugs. As outlined heretofore, we are concerned with an entirely different situation in connection with the two homicides before us.

We hold that the defendant was properly convicted of committing both of the homicides involved herein.

▆ The defendant's third assignment, to the effect that the court erred in permitting lay witnesses to testify that the defendant knew the difference between right and wrong, is not meritorious.

▆ The law in Tennessee is that a non-expert witness can testify to the sanity of

another without setting out the facts upon which his opinion rested. *Davis v. State*, 161 Tenn. 23, 36–38, 28 S.W.2d 993, 997 (1930); *Woolard v. Ferrell*, 26 Tenn.App. 197, 169 S.W.2d 134 (1942).

In *Davis v. State*, supra, our Supreme Court stated:

"The court below followed the rule announced in *Wheeler v. Parr*, 3 Tenn.Civ. App. 374, and we think this rule is sound. In that case, in a scholarly opinion, Judge Hughes reviewed the authorities, our own cases and others. He pointed out, while previous decisions of this court had stated broadly that a nonexpert witness might not testify as to the mental condition of another without stating the facts on which his opinion was based, that in none of those cases had a differentiation been made between such a witness testifying as to insanity and such a witness testifying as to sanity. Judge Hughes said: " 'It is clear that one who is perfectly sane, going about his ordinary avocations, and whose sanity has never been questioned, is judged by his entire course of conduct rather than by any particular incident or incidents; and to require a witness who expresses an opinion that such person is sane to give facts on which to base that opinion, further than that he has or had sufficient acquaintance with the person whose sanity is in question, or sufficient dealing or relations with him to form an opinion, would be to require the picking out of some special act or acts as distinguished from a series of thousands of acts, and to base his opinion of sanity or insanity on such special acts. This, it occurs to us, is requiring a witness to separate one sane act or a few sane acts from a thousand, and say that he bases his opinion on those, when in truth he does not do so, but rather on the acts of years, or a lifetime. On the other hand, take one whose sanity has never been questioned during an acquaintance of years and let reason become dethroned; his talk, his actions and looks will bespeak his changed condition by becoming un-usual. His acquaintances notice the un-usual, the changed conditions, they impress everyone and are not difficult to detail, as compared with the former condition. The changed look, talk and actions that thus impress the friend, neighbor or acquaintance is that on which the opinion of insanity is based; and it is but reasonable that the facts be given as the basis of the opinion of insanity. In other words, the exceptions to the rule attract attention and make such impressions as that those who are called on to give reasons for noting the exceptions can give them.' "

■ The defendant complains in his fourth assignment of error that the trial court erred in refusing to allow him or his attorneys to examine certain letters found by the police officers in the apartment of Susan Garrett Humphreys.

The trial court, in a pre-trial hearing, reviewed the contents of the subject letters and concluded that they contained nothing which would have been beneficial to the defendant.

At the trial, the court again declined to allow the defendant's counsel the right to inspect these letters. However, after the trial was completed, counsel for the defendant was permitted to review the contents of the letters. In his brief, the defendant says that the letters would have been competent evidence to corroborate the defendant's testimony concerning the involvement of Scholl, and others, in his and Susan's marriage, which involvement, as he contends, contributed to his alleged state of insanity.

From our review of Exhibit 44, we find therein approximately forty (40) letters, allegedly written by John R. Scholl to Susan G. Humphreys. They are dated within a six (6) month period preceding the homicides. The general contents of these letters consist of expression of love for Susan, vulgarities, quotations of poetry and passages from literary works, comments about American life and Scholl's job and station

in life. In addition, mention is made of several trips by Scholl to Johnson City and two trips by Susan to Maryland to see Scholl and his wife. In several of the letters, comments are made regarding Susan's impending divorce from the·defendant.

After considering the contents of these letters in the context of the entire record, we can see no way in which the contents of same could have aided the defendant in his defense. Moreover, there are no exceptions to the "hearsay rule" that would have allowed their admissibility under the facts of this case. The defendant had no knowledge of the contents of these letters prior to the homicides, and thus his state of mind, at the time, could have been in no way affected by the contents of these letters. Additionally, the state did not attempt to impeach the defendant's position that Susan and Scholl were carrying on an illicit romance, nor that Susan may have otherwise misbehaved. This record leaves no room for doubt that the jury had before it the full picture of the relationship that existed between Susan and Scholl, and as to how the defendant had been affected by that relationship.

We hold that the trial judge was correct in the various rulings he made with respect to these letters.

■ In the fifth assignment of error, the defendant says the court erred in permitting the attorney general to pursue a line of questioning with the defendant as to the wealth and circumstances of the defendant's family.

The attorney general explained that he was projecting a theory that the defendant was accustomed to having everything that he wanted, and when he could not have Susan, he killed her.

The defendant denied the attorney general's questions that his family was of great wealth, or that they provided him with everything that he needed or wanted.

■ In light of this entire record, we fail to see how this line of questioning prejudicially affected the defendant. It is always proper to place before the jury a party's background, education, employment and station in life in order for the jury to more properly evaluate his testimony.

We find no merit to this assignment.

■ We find nothing improper about the attorney general questioning one of the doctors as to whether or not he agreed with the McNaughton rule, which is the basis of the defendant's sixth assignment of error.

The doctor was an expert witness and had attempted to place the defendant within the framework of the McNaughton rule, by stating that the defendant did not know right from wrong at the time of the homicides. Whether he agreed or disagreed with the basic proposition enunciated in McNaughton was a factor for the jury to know in order to evaluate his testimony.

At one point in his testimony the doctor said he accepted the McNaughton rule as "one of the criterias" for legal insanity, and at another point he said he accepted "the rule as one standard for testing."

If the doctor was basing his opinion of the defendant's insanity upon other factors and criteria apart from the "right and wrong" test, then it was not improper for the jury to be so enlightened, and to know whether or not he accepted the McNaughton rule as the test for insanity.

■ In the seventh assignment the point is raised that the court erred in refusing to allow into evidence a medical history of the defendant taken by Kay Kuczynski, a staff member of the Watauga Mental Health Center.

We find no error here. The defendant conceded at the trial, as well as on this appeal, that the witness was not offered as an expert witness on the defendant's mental condition. The doctors, at whose behest she interviewed the defendant, were not offered as witnesses for the defendant. The doctors who examined the defendant after the homicides did testify and these records were made available to them. The

insistence that this hearsay evidence would have corroborated their findings is not tenable. Further, the defendant's mental condition at the time of the homicides was the crux of the issue, and not what it was at some times prior to the act. The experts who did testify took the position that the defendant was insane at the time of the act because of the peculiar facts and circumstances which were present at that time.

We have reviewed the notes made by the witness at this interview, and contrary to the defendant's insistence that such constitutes a medical history of the defendant, we find that the notes are mostly conclusions of the interviewer, the notes containing many deductions and conclusions made by the interviewer such as: "Very seriously wants his wife back, hurt by her, feels guilty," "very depressed today," "is beginning to understand," "seems less depressed," "anxiety reaction to wife leaving; suicidal thoughts, probably manipulative, depression, inability to concentrate," "he feels rejected completely, feels in a financial bind and wonders why he should live," "is lonely, extremely sensitive to lack of education," etc.

We can find no legal basis why this hearsay evidence should have been admitted. Particularly so, when it is considered that the witness-interviewer was not an expert and was not offered as such. As stated in the record, her only function, as a witness, was for the purpose of admitting these notes in the record.

The Uniform Business Records as Evidence Act, T.C.A. § 24–714, provides:

"A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness, testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

As stated in the Act, before a record is admissible, it must be relevant and must meet the other tests required by the statute.

 If the record is not relevant, or has been improperly prepared, and contains clearly inadmissible information and conclusions, such as are present here, then such cannot be admitted in evidence.

The defendant cites as his authority for the admissions of these notes the case of *Covey v. State,* Tenn.Cr.App., 504 S.W.2d 387, 392 (1973). We do not so interpret this case. To the contrary, that court stated, quoting from *Neas v. Snapp,* 221 Tenn. 325, 330, 426 S.W.2d 498, 501 (1968):

"Every report or other writing is not admissible simply because it was made or rendered in the conduct of some business or profession. A compliance with all the qualifications of the statute is a prerequisite to admissibility."

Moreover, as we view the subject notes, it would have added nothing appreciably to the defendant's cause, as it contained only cumulative information to other similar matters that had already been properly put before the jury. Contrariwise, we would note that the admission of same could have seriously affected the defendant's case from the standpoint of the degree of murder involved. We say this for the reason that on April 12, 1973, some four (4) weeks before the homicides, the notes contain an entry that the defendant was threatening to kill his wife.

We conclude that the court was correct in his ruling on the question raised in this assignment.

 In his last assignment, the defendant contends that the trial court committed error in allowing the prosecution to attack the defendant's character by showing his associations with other women.

During cross-examination of the defendant, the attorney general was permitted to question him regarding his associations

with other women, and the defendant admitted that he had dated other women and had sexual relations with them during his marriage to Susan.

In this case, the defendant had sought to place before the jury that he was very much in love with his wife, and that all of their marital difficulties stemmed from Susan's infidelities. He sought to project a theory to the jury that his mental state at the time of the homicides had been brought about by her indiscretions with Scholl and others, and by her divorcing him. The defendant specifically complains of a letter which he had written to another girl, which was admitted in evidence. We quote the contents of the letter as it appears in the bill of exceptions:

> "Hello, it was good to hear from you. It always makes my whole day when you call. Speaking of calling, I want to tell you why I can't call Saturday, you're going to be home and I'm going to be let's say tied up, top secret you know. Sure have missed you. Me and Nancy were talking about you last week and she told me about the time you got high on dope and he got busted by the way and freaked out and thought Barker was coming over to rape you. ha. Is that why you don't want to smoke any more or is it just with me. *Guess what I'm getting a divorce, that's right, how about that. It sure would be nice to see you. Maybe some night this week.* If you still think it will be a bad deal just forget it. I always had fun when we were together, but I want you to be happy. Why don't you call me Tuesday about 10 A.M. and we will talk about getting together. Hope to hear from you Love, Roger. Hope is my favorite word besides top secret and that's two words." Emphasis supplied.

Contrary to the defendant's expressed regret over the then impending divorce, it may be noted that the letter reflects considerable elation over the expected event.

We think all of this evidence of his associations with other women was competent for the purpose of contradicting the defendant as to his being a dutiful, faithful and loving husband, and to refute his position that he was emotionally upset over his wife's behavior and the divorce.

In *King v. State,* 91 Tenn. 617, 20 S.W. 169 (1892), which involved one attorney killing another attorney, the defendant claimed to be a loyal and loving husband to his wife, and that the deceased-attorney had used certain language in a pleading derogatory to the defendant-attorney's wife. Evidence of the defendant-attorney's relations, social and otherwise, to another woman, she being the deceased-attorney's client, was held to be proper cross-examination for the purpose of contradicting the defendant and to show motive.

The Supreme Court in *Helton v. State,* 195 Tenn. 36, 50, 255 S.W.2d 694, 699–700 (1953) said:

> "It is also insisted that the lower court was in error in that he permitted the state to cross-examine the defendant extensively about his domestic affairs and his relations with his wife. Counsel for the defendant were undertaking to show before the jury the defendant as a faithful husband and father and no doubt for the purpose of engendering sympathy for him from that body. This being true, we think the state was privileged to cross-examine him with reference to these relations and to show that he had been arrested for nonsupport of his wife and children."

In Wharton's Criminal Evidence, Vol. 1, 13th edition, § 179 (1972) it is stated that in homicide cases involving a spouse:

> ". . . It may be shown that the husband committed adultery; that he had improper relations with other women; that he made advances to other women;"

See also 40 C.J.S. Homicide § 229, and cases from other jurisdictions cited thereunder.

We do not find merit to this last assignment.

We note that in each of these two cases the trial judge pronounced judgment rendering the defendant infamous. Homicide is not an infamous crime. T.C.A. § 40–2712. The judgment of the trial court in each of these two cases is modified by vacating that portion thereof which erroneously adjudged the defendant infamous. *Howard v. State*, Tenn.Cr.App., 506 S.W.2d 951 (1974).

We have carefully reviewed this entire record, and we find no reversible errors.

Accordingly, all of the assignments are overruled, and the judgments of the trial court are affirmed, as modified.

RUSSELL and O'BRIEN, JJ., concur.