# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

## JULY 1999 SESSION



**FILED**

September 27, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | **NO. 03C01-9812-CC-00439** |
| Appellee, | ) | |
| | ) | **JEFFERSON COUNTY** |
| VS. | ) | |
| | ) | **HON. BEN W. HOOPER II,** |
| BLANE SCOTT HOLDER, | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (First Degree Murder - |
| | ) | Life Sentence) |

**FOR THE APPELLANT:**

**O. DUANE SLONE**
**REBECCA D. SLONE**
P.O. Box 1088
Dandridge, TN 37725

**FOR THE APPELLEE:**

**PAUL G. SUMMERS**
Attorney General and Reporter

**TODD R. KELLEY**
Assistant Attorney General
Cordell Hull Building, 2nd Floor
425 Fifth Avenue North
Nashville, TN 37243-0493

**ALFRED C. SCHMUTZER, JR.**
District Attorney General

**JAMES L. GASS**
Assistant District Attorney General
149 East Main St.
P. O. Box 70
Dandridge, TN 37725

**OPINION FILED:** _____

**AFFIRMED**

**JOE G. RILEY, JUDGE**

**OPINION**

The defendant, Blane Scott Holder, was convicted at a bench trial of first degree premeditated murder and sentenced to life imprisonment. In this appeal as of right, defendant raises the following issues:

> 1. whether the trial court erred in failing to find him not guilty by reason of insanity;
>
> 2. whether the current statute setting forth the affirmative defense of insanity is constitutional; and
>
> 3. whether the trial court erred in failing to consider his diminished capacity to form the requisite *mens rea* for premeditated murder.

Upon our review of the record, we **AFFIRM** the judgment of the trial court.

**FACTS**

**A. Lay Testimony**

Defendant lived in South Carolina and desired to come to Tennessee to investigate buying some real estate. Because defendant's driver's license had been suspended, the victim, Jason Seaborn, agreed to drive him to Tennessee.

During their drive in the early morning hours of May 5, 1996, defendant told Seaborn that he was going to kill him because Seaborn was Satan and defendant was Jesus Christ. Seaborn pulled into a fast-food restaurant parking lot, and defendant struck him with his fist and stabbed him in the chest with a knife. Seaborn entered the restaurant and defendant followed, holding the knife. Defendant threw the knife at Seaborn, and it went behind the customer service counter. Defendant walked up to the counter and told Vanessa Dunkhass, one of the employees, "I'm Jesus Christ, give me my f----g knife."

Dunkhass told defendant that he was not allowed behind the counter, and they argued. Defendant kept repeating his statement. Eventually, he shoved Dunkhass out of the way, went behind the counter, and retrieved the knife. He then went back to Seaborn, who had fallen to the floor, stabbed him in the chest again

2

and slashed his throat. As he did so, he looked up at Dunkhass and told her the victim was Satan; he was God; and God had told him to do it. Dunkhass retreated, and defendant went to the restroom and washed his hands. Seaborn's autopsy revealed that he would have died from any of the three lethal wounds.

Deputy Larry Jackson was the first police officer on the scene. Defendant was standing by his truck. Jackson testified that defendant began yelling at him that "he was the Lord Jesus Christ and that he had just smitten Satan." Defendant then stabbed the hood of his truck several times with the knife. Defendant then put his hands behind his back, bent over and said, "I'm ready to go, handcuff me." Officer Jackson declined to approach defendant and radioed for assistance. At that point, defendant retrieved his knife and started to approach Jackson in a threatening manner. Defendant told Jackson that he killed the victim because the victim had killed defendant's wife. Defendant was not married at the time.

When other officers arrived, defendant began to retreat. He continued to wave the knife and threatened to throw it. He started down an embankment, threw the knife down, and several officers followed him down the embankment. A fight ensued between defendant and several officers. At some point, defendant became unresponsive and the officers tried unsuccessfully to haul him back up the embankment with a rope. Eventually, several officers managed to get defendant into a cruiser, at which point he began trying to kick out the windows. When he was sprayed with pepper spray, he only "laughed and licked his lips."

Sheriff Doug Quarles was also at the murder scene and remembered defendant stating that he was Jesus Christ and the victim was Satan. After defendant was in jail, he told Sheriff Quarles that Satan had sent Quarles to kill him (defendant). Quarles testified that defendant was "deranged" the night they picked him up, and that he had paced his cell like an animal and refused to eat for a long time.

3

Several hours after defendant was jailed, TBI agent Steve Richardson interviewed defendant and obtained a statement. In the statement, defendant acknowledged hiring Seaborn to drive him because of his suspended license. He also recalled the victim getting a speeding ticket while they were in North Carolina. Defendant stated that he and the victim had been smoking marijuana, and he was taking "little yellow pills" for his "condition." After they arrived in Tennessee, defendant felt something touch him in his side. This happened several times. He told Seaborn that he thought he was Jesus Christ, and Seaborn responded that he was Satan. He told Seaborn that God told him to kill him, and that he was going to kill him. Defendant had his knife in his hand during this conversation.

According to defendant's statement, Seaborn pled for his life. He pulled into the restaurant parking lot and tried to take the knife away from defendant. Defendant hit and then stabbed Seaborn. The encounter in the restaurant followed. Defendant stated that he had wanted Seaborn to die. He further stated that he had lied to the officers and told them that Seaborn had killed his girlfriend. He stated that he wanted the officers to shoot him, that he "cussed them for a while and then told them that I was Jesus Christ."

Defendant's statement also contains the following:

> I know that killing Jason was wrong. I knew that when I killed him that I could go to jail for a long time. I know that I did wrong. I know that I should not have killed him. I have a good mom that taught me right from wrong.

He further explained his actions in stabbing his truck as being "raging mad" and unable to control himself.

Richardson wrote the statement as defendant made it. After they were finished, Richardson offered it to defendant for review and his signature. Officer Bill Withers was also present at this time, and defendant told Withers that he "thought he had killed the Devil but the Devil was probably in the room right now." Defendant

4

then refused to sign the statement and asked for an attorney.

A search of the truck in which defendant and Seaborn had traveled revealed some marijuana. Tests performed on defendant's blood were negative on alcohol and basic drugs; the test sample was unsuitable for detecting the presence of marijuana.

On May 7, 1996, Public Defender Edward Miller met with defendant to assist him in preparing an indigency affidavit. At one point during this meeting, defendant referred to Miller as "Lucifer." Miller wrote in defendant's name on the form, and defendant crossed his name out and filled in "Jesus Christ." Defendant initially signed the affidavit "B. Scott Holder" and then crossed out his signature and filled in "Jesus Christ."

Merlin Foister was one of defendant's jailers. Foister testified that, during the afternoon of defendant's first day in jail, defendant told him that he was Jesus and God was mad at him for not "get[ting] [the victim's] head off." Foister also testified that defendant refused to eat, and at one time complained of demons coming out of the floor drain trying to get him. When defendant's mother visited him during the first several weeks of his stay, defendant would scream at her that he was Jesus.

Stacy Walker testified that he had known defendant twelve to fifteen years. About six months before the murder, Walker observed defendant beginning to develop uncontrollable rages. Three days before the crime at issue, Walker and defendant's mother had taken him to an emergency room for a mental evaluation because defendant had been acting strangely. Defendant was released, according to Walker, because they found nothing wrong.

After the murder, Walker spoke with defendant over the telephone about the

5

crime. According to Walker, defendant expressed no remorse. The only explanation he heard defendant give was that he had smoked a marijuana cigarette that had been laced with something. Defendant never mentioned anything about Jesus Christ or Satan to him.[1]

Melvin Douglas Bennefield, Jr., a longtime friend of the defendant, testified that he had originally planned to drive defendant to Tennessee, then changed his mind after defendant slapped his hat off his head. He advised the victim not to take defendant because he "thought he was crazy." Bennefield also testified that a "good while" before the murder in this case, defendant had remarked about what it would feel like to kill someone. Bennefield testified that defendant had repeated this query about two weeks before killing the victim.

Andrew Thomas Fletcher, defendant's friend of fifteen years, testified that he had talked with defendant five or six times after the murder. Defendant acknowledged killing the victim but never expressed any remorse. Defendant told him a month before the trial that after he was released, he was going to kill someone for keeping some of his mother's money. According to Fletcher, defendant thought he would be released "before Christmas."

## B. Mental Evaluations

Defendant was admitted to Middle Tennessee Mental Health Institute on June 24, 1996, for a thirty-day evaluation. He was diagnosed as not competent to stand trial,[2] and as meeting the criteria for an insanity defense. He was further judged committable to a mental health institution. He was prescribed medication and returned to jail.

---

[1]Walker thought that defendant may have been at Middle Tennessee Mental Health Institute at the time of this conversation.

[2]The treating psychiatrist and psychiatric social worker drew this conclusion. The treating psychologist disagreed, finding that defendant was competent to stand trial.

6

In October 1996, defendant was judicially committed to Middle Tennessee Mental Health Institute. He was transferred to Lakeshore Mental Health Institute in August 1997 for another evaluation of his competency to stand trial. In September 1997, defendant was pronounced competent to stand trial, but still committable. In February 1998, defendant was pronounced still competent to stand trial, but no longer committable. Accordingly, defendant was discharged to jail with continuing outpatient treatment. The defendant was tried in July 1998.

### C. Expert Testimony

The trial court also heard testimony from two expert witnesses. Dr. Samuel Craddock testified as an expert witness in forensic psychology. Dr. Craddock was part of the forensic team that evaluated defendant at the Middle Tennessee Mental Health Institute in June and July 1996. According to Dr. Craddock, the team diagnosed defendant with paranoid schizophrenia, a severe mental disorder. The team further concluded that on the night of the victim's murder, defendant "was out of touch with reality at that time and was making comments and showing symptoms of paranoid schizophrenia." His violent actions were the result of hallucinations and delusions, causing him to perceive the victim as a threat against whom he needed to protect himself. According to Dr. Craddock, defendant had not perceived his actions in killing the victim as being wrong, but as being in self-defense. When questioned about defendant's statement to Agent Richardson in which defendant acknowledged that killing the victim was wrong, Dr. Craddock testified that, while defendant may have realized that killing someone was wrong, defendant "was internally coerced [by the voices and the delusional beliefs] to do something that he knew . . . was wrong." Dr. Craddock also testified that the team did not think that defendant's actions in killing the victim were the result of his ingesting drugs or alcohol.

Dr. Kathleen Broughan also testified as an expert in the field of forensic psychology. Dr. Broughan met with and evaluated defendant in the latter part of

7

May 1996 at the Jefferson County jail. Dr. Broughan agreed with the Middle Tennessee Mental Health Institute's diagnosis of paranoid schizophrenia. According to Dr. Broughan, "[e]ven though [defendant] understood or felt that killing was wrong, he felt that this was something that he had to obey because it was God that was telling him to do this." At the time of the crime, defendant "was living in [a] different reality" and "was not able to appreciate the wrongfulness [of his conduct in killing the victim], that he was in fact behaving in accordance with his delusional system." She further testified that, as a result of his delusions, defendant had felt he had "no choice" in killing the victim after receiving what he believed to be a mandate from God.

### D. Trial Court's Determination

This case was tried by the trial judge without a jury. In rejecting the insanity defense, the trial judge first found that defendant had established by clear and convincing evidence that he had a "severe mental disease or defect" at the time he killed the victim. The court further found, however, that defendant "did understand what he was doing, regardless of him saying that he was Jesus and he was killing Satan." The court relied heavily on defendant's statement to Agent Richardson in drawing this conclusion. In that statement the defendant acknowledged that he knew the killing "was wrong;" he could "go to jail for a long time;" and he knew "[he] should not have killed him." However, the trial judge also referred to defendant's refusal to drive on his suspended license (as indicative of his appreciation for the difference between lawful and unlawful); his refusal to sign his statement followed by a request for an attorney (as indicative that he knew he was in trouble); his statement to Officer Jackson that he had killed the victim because the victim had killed his wife (as indicative of knowing it was wrong to kill the victim and attempting to offer some justification); his later explanation that he had smoked marijuana that had been laced with something (as indicative that he had done wrong and was attempting to formulate an excuse); and defendant's failure to mention to his friends his belief that he was Jesus.

8

# I. INSANITY DEFENSE

## A. Comparison of Prior and Current Statute

The defense of insanity became an affirmative defense effective July 1, 1995.  The statute now provides:

> It is an *affirmative defense* to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a *severe* mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts.  Mental disease or defect does not otherwise constitute a defense. *The defendant has the burden of proving the defense of insanity by clear and convincing evidence.*

Tenn. Code Ann. § 39-11-501(a)(1997)(emphasis added).  Defendant contends that he met his burden of proof, and the trial court erred in concluding otherwise.  Upon our review of the record, we conclude the evidence is sufficient to support the determination of the trial court.

The current version of Tenn. Code Ann. § 39-11-501 (1997) is fundamentally different than the prior version. *See* Tenn. Code Ann. § 39-11-501(1991).  The prior version provided that insanity was simply a "defense" and not an "affirmative defense" as provided in the current version. *Id.*  Furthermore, the prior version allowed this defense "if, at the time of such conduct, as a result of mental disease or defect, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of law." *Id.*  The current version provides that this "affirmative defense" applies when "the defendant, as a result of a *severe* mental disease or defect, was *unable to appreciate the nature or wrongfulness of such defendant's acts.  Mental disease or defect does not otherwise constitute a defense.*" Tenn. Code Ann. § 39-11-501(a)(1997)(emphasis added).  Furthermore, and most significantly, the new statute provides that the burden of proof is upon the defendant to establish insanity by "clear and convincing evidence." *Id.*

Under the prior statute, if the evidence adduced raised a reasonable doubt as to the defendant's sanity, the burden of proof then fell upon the state to establish sanity beyond a reasonable doubt. State v. Jackson, 890 S.W.2d 436, 440 (Tenn. 1994). In order for the state to meet its burden of proving sanity, it could provide any "evidence which is consistent with sanity and inconsistent with insanity." State v. Sparks, 891 S.W.2d 607, 616 (Tenn. 1995)(quoting Edwards v. State, 540 S.W.2d 641, 646 (Tenn. 1976), *cert. denied* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 777 (1977)).

## B. Legislative Intent

The 1995 amendment was an obvious expression of legislative intent to restrict the defense of insanity. The mental disease or defect must now be so "severe" as to make the defendant "unable to appreciate the nature or wrongfulness of [his/her] acts." Tenn. Code Ann. § 39-11-501(a)(1997). Furthermore, the burden is now on the defendant to establish insanity by "clear and convincing evidence." *Id.* "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Hodges v. S. C. Toof & Co., 833 S.W.2d 896, 901 fn. 2 (Tenn. 1992); *see also* T.P.I. - CRIM. 40.16(b)(4th ed. 1995). This is a much different and higher standard of proof placed on a defendant.

## C. Federal Legislation

The language of the current version of Tenn. Code Ann. § 39-11-501 (1997) is patterned after and virtually identical to the federal Insanity Defense Reform Act of 1984, which provides as follows:

> (a) Affirmative defense.---It is an affirmative defense to the prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.
> (b) Burden of proof.---The defendant has the burden of proving the defense of insanity by clear and

convincing proof.

18 U.S.C. § 17.  *See also* Raybin, *Tennessee Criminal Practice and Procedure*, § 28.40 (Supp. 1997).

Prior to the passage of this federal legislation, a defendant under federal law was presumed to be sane until the introduction of evidence of insanity, at which point the burden shifted to the government to prove sanity beyond a reasonable doubt.  Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895); United States v. Voice, 627 F.2d 138, 148 (8th Cir. 1980).  As previously noted, the same was true in Tennessee.  Jackson, 890 S.W.2d at 440.  Under this federal legislation, the burden is now clearly on the federal defendant to prove insanity by clear and convincing evidence, and not on the government to prove sanity.  *See generally* United States v. Still, 857 F.2d 671, 672 (9th Cir. 1988); United States v. Amos, 803 F.2d 419, 421-22 (8th Cir. 1986).  Although the government is required to prove all essential elements of a crime beyond a reasonable doubt, sanity is not an element of a crime.  *See generally* Patterson v. New York, 432 U.S. 197, 204-16, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).  Thus, it is appropriate to place the burden of proof on a defendant to establish insanity by clear and convincing evidence.  *See* Amos, 803 F.2d at 421.

We conclude, as have the federal courts, that our current insanity statute places the burden on the defendant to establish insanity by clear and convincing evidence, and not on the state to prove sanity.

**D.  Standard of Review**

In a bench trial, the verdict of the trial judge is entitled to the same weight on appeal as a jury verdict.  State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978).  A

11

finding of guilt by the trial court shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e).

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this Court. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the state is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In determining the issue of insanity, the trier of fact may consider both lay and expert testimony and may discount expert testimony which it finds to be in conflict with the facts of the case. Sparks, 891 S.W.2d at 616; Jackson, 890 S.W.2d at 440. Where there is a conflict between expert testimony and testimony as to the facts, the trier of fact is not required to accept expert testimony over other testimony and must determine the weight and credibility of each in light of all the facts and circumstances of the case. Edwards, 540 S.W.2d at 647. In determining the defendant's mental status at the time of the alleged crime, the trier of fact may look to the evidence of his actions and words before, at, and immediately after the

12

commission of the offense. <u>Sparks</u>, 891 S.W.2d at 616; <u>Humphreys v. State</u>, 531 S.W.2d 127, 132 (Tenn. Crim. App. 1975).

### E. Trial Judge's Findings

The trial judge expressly found that the defendant had failed to meet his burden of proof as to insanity. Thus, although the trial judge found that the defendant had established by clear and convincing evidence that he had a "severe mental disease or defect" at the time of the murder, he found that the defendant had not established by clear and convincing evidence that he was unable to appreciate the nature or wrongfulness of his acts.

### F. Our Determination

The defendant was required to establish insanity by clear and convincing evidence, which is evidence that there is no serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. <u>Hodges</u>, 833 S.W.2d at 901. The trial judge expressly concluded that the defendant failed to establish insanity by clear and convincing evidence. Specifically, the trial judge concluded that the defendant failed to establish that he was unable to appreciate the nature or wrongfulness of his acts. He relied primarily upon the actions and words of the defendant before, at and after the commission of the offense, which he had a right to do. <u>Sparks</u>, 891 S.W.2d at 616; <u>Humphreys</u>, 531 S.W.2d at 132. Viewing the evidence in a light most favorable to the state, we conclude that a rational trier of fact could have made such a finding.

Accordingly, the trial court did not err in its determination that the defendant did not prove the insanity defense by clear and convincing evidence. This issue is without merit.

13

## II. CONSTITUTIONALITY OF TENN. CODE ANN. § 39-11-501

Defendant next contends that Tennessee's current insanity defense statute is unconstitutional. As set forth above, the current statute provides a defense on the basis of insanity where the defendant proves that, "as a result of a severe mental disease or defect, [he] was unable to appreciate the nature or wrongfulness of [his] acts." Tenn. Code Ann. § 39-11-501(a) (1997). The prior statute allowed a defense of insanity where, "as a result of mental disease or defect, the [defendant] lacked substantial capacity either to appreciate the wrongfulness of [his] conduct *or to conform that conduct to the requirements of law.*" Tenn. Code Ann. §39-11-501(a) (1991) (emphasis added); *see also* Graham v. State, 547 S.W.2d 531, 543 (Tenn. 1977) (adopting the Model Penal Code insanity defense which included lacking "substantial capacity ... to conform his conduct to the requirements of the law"). Defendant objects to the deletion of this latter language as a denial of due process.

We are not persuaded. As previously stated, Tennessee's current statute is patterned closely after the federal insanity defense statute. *See* 18 U.S. C. § 17. Prior to the enactment of this statute, a defendant in federal court could succeed on the defense of insanity if, as a result of mental disease or defect, he lacked substantial capacity to appreciate the wrongfulness of his conduct *or to conform his conduct to the requirements of the law. See* United States v. Weeks, 716 F.2d 830, 831-32 (11th Cir. 1983) (emphasis added). The deletion of this latter language has been found constitutional. *See* United States v. Freeman, 804 F.2d 1574, 1576 (11th Cir. 1986). We agree with our federal counterpart. This issue is, therefore, without merit.

14

### III. SUFFICIENCY OF EVIDENCE OF PREMEDITATION

Finally, defendant contends that he adduced sufficient proof of his diminished mental capacity so as to negate the *mens rea* requirement of premeditation necessary to support his conviction for first degree murder. Again, we disagree.

At the time defendant killed Seaborn, first degree premeditated murder was defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a) (1) (1997). A premeditated killing is one "done after the exercise of reflection and judgment," and where the intent to kill was formed prior to the act itself. Tenn. Code Ann. §39-13-202(d) (1997). The statute further provides that "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

### A. Diminished Capacity

A defendant may not be convicted of first degree premeditated murder if, as the result of a mental disease or defect, he or she lacked the capacity to form premeditation. *See generally* State v. Hall, 958 S.W.2d 679, 690 (Tenn. 1997). In this case, however, the defendant did not put on evidence to this effect. While there was significant expert testimony that defendant was suffering from paranoid schizophrenia at the time he killed the victim, and that this mental disease affected his ability to perceive reality, this does not necessarily imply that the defendant lacked the capacity to premeditate. This Court may not assume that a defendant suffering from paranoid schizophrenia accompanied by delusions is necessarily incapable of premeditated murder. Moreover, the trial court's finding that defendant did understand the wrongfulness of his acts implies that defendant engaged in some form of judgment and reflection prior to killing Seaborn -- especially in light of the time and effort defendant used in completing his crime. Looking at the evidence

15

in a light most favorable to the state, a rational trier of fact could have determined beyond a reasonable doubt that defendant was capable of premeditation. This argument is without merit.

## B. Premeditation

However, we must still determine whether the state put on sufficient proof to establish that defendant did, in fact, kill Seaborn intentionally and with premeditation. We hold that it did. Defendant's statement reveals that he told Seaborn that he was going to kill him prior to actually stabbing him, and prepared himself to do so by procuring his knife. Seaborn pled for his life, and defendant hit him with his fist twice. Seaborn got out of the truck, and defendant stabbed him once. Seaborn then fled into the restaurant and defendant followed. Once inside, defendant threw his knife at the victim, and then argued with an employee in order to retrieve it. After he shoved an employee out of the way and retrieved his knife, defendant found his prostrate victim, stabbed him again and then slashed his throat. He then went to the restroom and washed his hands.

Whether a defendant has acted with premeditation is a question for the finder of fact to determine, and it may be inferred from the manner and circumstances of the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). The following factors may be considered in deciding whether the murder was premeditated: the procurement and use of a deadly weapon upon an unarmed victim, the defendant's declarations of his intent to kill, the infliction of multiple wounds,[3] defendant's calmness immediately after the killing; and a particularly cruel killing. *See* State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Brown, 836 S.W.2d 530, 541-42 (Tenn. 1992). Viewing the evidence in a light most favorable to the state, the proof

---

[3]Multiple wounds alone may not support a finding of premeditation. Brown, 863 S.W.2d at 542.

16

was sufficient for a rational trier of fact to have found beyond a reasonable doubt that defendant killed Seaborn intentionally and with premeditation.

Accordingly, this issue is without merit.

## CONCLUSION

In summary, we conclude (1) the trial court's finding that the defendant did not establish the defense of insanity by clear and convincing evidence was not error; (2) the current insanity defense statute is constitutional; and (3) the evidence was sufficient to support the guilty verdict of premeditated first degree murder.

Accordingly, the judgment of the trial court is **AFFIRMED**.

_____
**JOE G. RILEY, JUDGE**

**CONCUR:**

_____
**GARY R. WADE, PRESIDING JUDGE**

_____
**DAVID H. WELLES, JUDGE**

17