IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 21, 2002 Session

## STATE OF TENNESSEE v. ROGER DALE QUILLEN

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S42,442      Phyllis H. Miller, Judge**

_____

**No. E2001-01411-CCA-R3-CD**
**January 8, 2003**
_____

The appellant, Roger Dale Quillen, was convicted by a jury in the Criminal Court of Sullivan County of aggravated burglary, felony murder, premeditated first degree murder, and simple assault. The trial court merged the murder convictions and sentenced the appellant to an effective sentence of life imprisonment. On appeal, the appellant asserts that he established the affirmative defense of insanity by clear and convincing evidence and, therefore, he should have been found not guilty by reason of insanity. After a careful review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Kenneth F. Irvine, Jr., Knoxville, Tennessee (on appeal), and Larry Dillow and Richard Hopson, Kingsport, Tennessee (at trial), for the appellant, Roger Dale Quillen.

Paul. G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Barry Staubus and Gene Perrin, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I.  Factual Background**

At approximately 7:00 a.m. on December 6, 1998, the appellant went to his father's house on Bloomingdale Pike in Kingsport, Tennessee, to discuss putting a mobile home on property owned by his father in Scott County, Virginia. After his father rejected the idea, the appellant went to his own house, retrieved an axe and two rifles, and returned to his father's house. The appellant then used the axe to break through the back door and gain access into the house. As the appellant entered the house, his father approached him to ask what he wanted. However, before his father could finish his sentence, the appellant loaded a round into the chamber of the rifle and shot his father in the chest. His father fell to the floor.

Wayne Presley, Jr., who was living with the appellant's father at the time, heard the commotion in the kitchen and, upon entering the room, saw "fireworks" as the appellant's father fell to the floor. Wayne[1] begged the appellant, "no, Roger, no," but the appellant did not acknowledge Wayne as he reloaded the gun and shot his father a second time. Wayne then pleaded, "Roger, Lord, please don't shoot me." The appellant turned to Wayne and said, "I'm not going to hurt you, I love you, I'm not going to shoot you. . . . I'm going to go over, and I'm going to shoot Lynn, and I'm going to shoot myself, and tell Susan, she can have it all." As the appellant left the house, he retrieved the axe and told Wayne, "[Y]ou can call Lynn too if you want to try to save his life." Wayne called 911.

The appellant drove approximately thirteen miles to his brother Lynn's mobile home in Scott County, Virginia. When he arrived, he parked his truck behind an old barn so that the vehicle could not be seen from his brother's home. The appellant then walked up to the mobile home and used the axe to break the window in the door. Lynn heard a "loud crash" and got out of bed to investigate. After arming himself with a loaded shotgun, Lynn observed his brother coming around the corner toward the master bedroom. Lynn pointed his shotgun at the appellant and told him, "[S]urely to God, a little piece of property ain't worth all of this." The appellant, who had his gun to his side, said, "[P]lease, brother, don't kill me." Lynn told the appellant to lay down his weapon and the appellant complied.

The brothers sat down on the couch and the appellant informed Lynn that he had shot and killed their father. The appellant then asked Lynn to take him outside and shoot him, but Lynn refused. At that time, the phone rang. It was the Scott County Sheriff's Department calling to warn Lynn that his brother was on the way to his home to harm him. Lynn informed the authorities that the appellant had already arrived and the dispatcher instructed Lynn to keep the appellant calm until the officers arrived. The officers arrived fifteen minutes later. The appellant cooperated as the officers took him into custody, telling them to "go ahead and treat me as the murderer I am." The officers took possession of the appellant's rifle and the ammunition found in the pockets of the appellant's jacket. The officers also recovered a loaded .22 rifle from the appellant's truck.

The appellant's father died as a result of the gunshot wounds. On March 17, 1999, the Sullivan County grand jury charged the appellant in a four-count presentment with aggravated burglary, felony murder, premeditated first degree murder, and aggravated assault.

At trial, Lieutenant Damon C. Gordon of the Sullivan County Sheriff's Department testified that he was the first officer to arrive at the appellant's father's house on December 6, 1998. Upon entering the house, Lieutenant Gordon observed damage to the door and saw the appellant's father laying in the floor with gunshot wounds to the neck and chest. The paramedics, who had already arrived, alerted Lieutenant Gordon that the appellant's father was dead. Except for the

---

[1] Because the victim and two witnesses share the last name "Quillen" and two witnesses share the last name "Presley," we have elected to utilize first names for the purpose of brevity. We intend no disrespect by this procedure.

-2-

damage to the door, Lieutenant Gordon observed no signs of struggle and recovered no weapons. Lieutenant Gordon found a shell casing lying near the body.

Wayne Presley, Jr., testified that at the time of the shooting he was living with the appellant's father in order to care for him and his yard. Wayne was dating the appellant's sister, Susan, at that time and at the time of trial he and Susan were married. Wayne recalled that when he first observed the appellant that morning, the appellant appeared "very angry, . . . eyes in the back of his head." However, after shooting his father, the appellant looked as though "a ton of bricks fell off him." Wayne acknowledged that the relationship between the appellant and his father was strained. Wayne testified that the appellant did not say anything about hearing voices commanding him to shoot his father.

On cross-examination, Wayne testified that the appellant's father intimidated and controlled Susan and would not allow her to marry Wayne. Moreover, the appellant's father was not kind to the appellant. Although Wayne described the appellant as nice and gentle, he testified that he had observed changes in the appellant over the past eight years. Wayne explained that "you could kind of tell that [the appellant] was in a different place." Wayne recalled an incident where the appellant, believing he was a prophet, invited Susan and Wayne to the appellant's home to pray for his father and brother. Wayne testified that on the day of the offenses, the appellant never pointed the rifle at him.

Lynn Quillen testified that the appellant did not mention command hallucinations, religion, or numbers when he told Lynn he had shot and killed their father. Lynn testified that the appellant appeared calm and did not tell Lynn that he had "snapped." Lynn recalled that the appellant cooperated with the officers when they arrived and told them to be careful because the gun still had two live rounds in it. The appellant also told Lynn to take the seven hundred dollars ($700) from the appellant's coat, have his door repaired, and then give the remainder of the money to the appellant's wife.

When asked to describe his relationship with the appellant, Lynn stated that he and the appellant "seemed to get along . . . [and] were not hostile toward one another." Lynn testified that the appellant had visited him approximately three weeks before the offenses and announced that he had been diagnosed as homicidal and suicidal; however, the appellant had assured Lynn that he was not suicidal. Lynn testified that his father had provided in his will for Lynn, the appellant and Susan to inherit property located in Scott County, Virginia. Lynn added that the appellant wanted to place a mobile home on that property. Lynn described the appellant's relationship with his father as one of "indifference" and stated that the appellant was jealous of his father's relationship with Lynn. Lynn testified that his father was good to his family and "one of the best people I have ever known in my life."

On cross-examination, Lynn conceded that he told Lieutenant David Klepper that "[i]t seemed like there was a wedge between [the appellant] and Dad" and that the appellant constantly begged for his father's love. Lynn testified that, although his father had initially told the appellant

that he could not place the mobile home on the property, his father had changed his mind but had not informed the appellant. Lynn conceded that on the day of the offenses, "a calm" came over the appellant when Lynn spoke his name; however, Lynn attributed the calm to the fact that the appellant "was on the wrong end of a gun." Lynn denied telling his sister that the appellant was deranged. Finally, Lynn acknowledged that he would inherit the appellant's share of the property if the appellant were convicted.

Deputy Martha Whitt of the Scott County Sheriff's Department testified that on December 6, 1998, the department received a call that "there was someone in route (sic) from Sullivan County to a Quillen residence." Deputy Whitt responded to the call. When she arrived at Lynn Quillen's mobile home, Deputy Whitt observed two men sitting on a couch. As she handcuffed the appellant, he told her to "go ahead and treat me as the murderer I am. . . . [D]o whatever you need to, I know I am probably going to hell, I will probably die of lethal injection." Deputy Whitt secured the appellant's rifle and the appellant warned her to be careful because it was still loaded. Deputy Whitt then recovered ammunition from the appellant's jacket and a .22 rifle from the appellant's truck.

Scott County detective, J.P. Bledsoe, questioned the appellant at the jail. Detective Bledsoe testified that throughout questioning the appellant was polite and cooperative and did not appear to be confused or in an altered state. Moreover, the appellant did not speak of command hallucinations or religion. After Detective Bledsoe obtained the appellant's personal information, the appellant inquired about his father's condition and Detective Bledsoe responded that the appellant's father had died.

Detective Bledsoe recorded the appellant's statement in writing and had the appellant review the statement to ensure that it was accurate. In his statement, the appellant acknowledged that his father had decided to allow him to put the mobile home on the Scott County property. However, when he went to visit his father on the morning of December 6, the appellant told Detective Bledsoe that his father

> had done a 180° turn . . . [and] said I could not put the trailer there, he did not want me over there bothering my brother, and did not want me controlling anything over there, and to stay away from him and my brother. . . . I went home and got my rifles and went down the road to where he lived. I loaded the high powered rifle with four cartridges. I took the sledge hammer and knocked in the door. He came toward me and asked what was going on. I shot him twice with the high powered rifle, a 7.67 Russian.

According to his statement, the appellant advised Wayne Presley that he was "going to my brother's, I'm going to kill him and then kill myself. I want it all to be over with." The appellant then left, taking the rifles and hammer with him. The appellant drove to Lynn's mobile home, broke a window with the sledge hammer, and went inside. Upon being confronted by Lynn, the appellant informed Lynn,

-4-

I came over here to kill you but I can't do it. I want you to kill me [but] . . . I don't want to bleed on your carpet. I'll go to the door or outside and you can shoot me anyway you want because I've killed Dad. . . . I'd been abused too long and . . . I snapped.

Detective Bledsoe testified that the appellant requested to speak with him on December 15, but he advised the appellant to contact his lawyer.

On cross-examination, Detective Bledsoe conceded that he did not record his interview with the appellant on audio tape. Detective Bledsoe recalled that the appellant was "different" when he came into contact with him on December 15, but stated that the appellant did not appear to be a person who had "snapped." When asked about the motive for the shooting, Detective Bledsoe responded that he "felt like there was a problem over some real estate."

After the State completed its case in chief, the appellant presented the following witnesses in support of the affirmative defense of insanity: Lisa Quillen, the appellant's wife; Dr. Eric Moffet, the appellant's treating psychiatrist; Dr. Thomas Schacht, a forensic psychologist; J.M. Baker, a long-time friend of the appellant; Dr. Tony Gonzales, the pastor of Stateline Missionary Baptist Church; and Susan Quillen Presley, the appellant's sister.

Lisa Quillen testified that she and the appellant had been married for twenty years. She testified that when they were first married, the appellant had been able to work "a regular job" and had obtained his real estate license. However, the appellant never "earned a living" as a real estate agent. Lisa also testified that since closing his own real estate business, the appellant had not been able to maintain full-time employment. Instead, the appellant worked as a landlord, taking care of the couple's rental properties.

Lisa testified that the appellant had always been nervous, prone to panic attacks, and had strange sleeping patterns. However, she never discussed psychiatric treatment with the appellant because she attributed his behavior to his "dysfunctional upbringing." Then, in 1993, while working as a real estate agent, the appellant was the victim of an armed robbery which caused his behavior to worsen. According to Lisa, the appellant became very paranoid and unable to work. She testified that the appellant would not sleep at night and would wake her, talking to her in a rapid speech pattern and jumping from topic to topic. Lisa testified that the appellant sought psychiatric treatment following the robbery. Despite his bizarre behavior, Lisa described the appellant as sweet and affectionate, not aggressive or violent.

Lisa testified that one night in 1994 the appellant woke her to tell her about a conversation he had with God and to ask her to get down on the floor and pray with him. The appellant told Lisa that the devil told him that "things will get worse." Lisa testified that after this incident, the appellant began speaking in "a really strange voice" and using words such as "thee" and "thou." That same weekend, the appellant told Lisa to "[t]hrow away your birth control pills. . . . It is an abomination to try and prevent something as beautiful as the birth of a child. God has told me that we can have a baby." The appellant then put on a trench coat which had belonged to Lisa's

grandfather "because he was a saint and I now feel that I can wear it." The appellant left the house, saying,

> Do not worry about me my wife, I am going to my cousin's house. I must take the Bible and I must tell my cousin that the end of the world is near and do not worry about me, I will return, nothing will happen to me, do not fear.

When the appellant returned, he informed Lisa that he and his cousin, Randall, were the last two prophets and that they "must go house to house and . . . tell people that the end of the world is near." The appellant then called his sister, Susan, and had her come to his house to "pray for our father and brother."

Lisa testified that the appellant did not sleep that night and, when she woke up Sunday morning, the appellant was dressed and ready for church. When the couple arrived at Stateline Baptist Church, the appellant hurried inside. Lisa recalled that

> [t]he preacher was up teaching Sunday school and [the appellant] walked straight down the hall and [was] very intrusive, just babbling, talking about David the King and all this psycho-babble or whatever you want to call it, and I kept saying, "Roger please come here, come here," because I was totally embarrassed. I wanted to crawl under the pew. But . . . he said "no." He was talking loud . . . and it was like he was in another world and he walked straight down to where the preacher was and he had his Bible down and he started . . . preaching to the preacher.

Lisa testified that she did not discuss this episode with the appellant or his psychiatrist because she did not want the appellant to think that she was embarrassed by him.

Lisa described the appellant's relationship with his father as one-sided. She stated that the appellant loved his father and desired to have a relationship with him, but "[h]is dad would not allow that." Lisa testified that all the appellant's father ever did was "cuss" and "rag" the appellant and, despite this behavior, the appellant never argued with his father. Lisa testified that the appellant never "expressed himself" to his father, except in letters.

Lisa testified that the first time the appellant was suicidal was after his mother died of cancer in 1987. Lisa recalled that the appellant was upset and shouting, "Why does my dad do this to me, why can't he love me?" The appellant then picked up a gun and said, "You know, my mama's gone, he just wants me to be gone too." Lisa screamed and grabbed the gun. Lisa testified that the appellant's most recent suicidal episode was approximately two years before the instant offenses, but that he had experienced fifteen to eighteen of these episodes over the past twelve years.

Lisa's testimony then focused on the period of time just prior to the shooting. At that time, the appellant was taking only Xanax even though his treating physician, Dr. Moffet, had also prescribed Depakote. Lisa explained that the appellant had not informed her that he had been diagnosed as having bipolar disorder. Lisa believed that the Depakote was simply an antidepressant

and she asked the appellant to refrain from taking the Depakote because she was trying to get pregnant. The appellant stopped taking the Depakote approximately two weeks before the offenses.

Lisa testified that she observed a great change in the appellant during the two weeks prior to the offenses. According to Lisa, the appellant was on an emotional roller coaster.

> His mood swings . . . were more apparent and they happened faster. One day he would be up and the next day he would be down. His appearance, he wouldn't even bathe. . . . I'd come home and the first thing I'd notice is, "Well, he's not even taken a bath today. I can't believe it." He could go a week with out bathing. . . . [G]et out of bed and go to Lowes or some place, just same clothes, would not comb his hair, wore the same clothes for a week.

Lisa testified that on the Friday before the shooting, the appellant was "extremely energetic, and just euphorically happy." She recalled that the appellant woke her at 1:30 a.m. Saturday morning to pray for his father and brother. He woke her again at 5:30 a.m., advising her to drink her milk and orange juice. Lisa testified that his mood on Saturday was very different, describing the appellant as "psychotic." Lisa stated that she "fussed" at the appellant because she did not want him to use a credit card to order an item from the internet. The appellant became upset and "all of a sudden he got real loud in the kitchen and he said, 'I don't understand, I don't understand . . . why are you fussing at me about it.'" The appellant then began opening and shutting drawers and cabinet doors, shouting, "Don't fuss at me, I can't handle it, I can't handle it."

Lisa testified that the appellant was completely exhausted that evening and went to sleep early. He woke Lisa at 11:00 p.m. and told her, "I'm rested and I've got a lot of energy and I'm going to go down to the studio and work for a while." He left and Lisa did not see the appellant again before the shooting. Lisa learned about the shooting when a friend called Sunday morning and asked her what had happened at her father-in-law's house. On the way to church, Lisa stopped at her father-in-law's house where she was informed that the appellant had been arrested and was in the Scott County jail.

Lisa testified that she immediately went to the jail to visit the appellant. She stated that the appellant was calm that first day, but he did not remain calm in the days following his arrest. She stated that the appellant "was absolutely driving everybody crazy," calling Lisa and her parents several times a day. Lisa testified that to her knowledge the appellant was receiving his medication while in jail and that she "would have never dreamed" that the appellant would kill his father.

On cross-examination, Lisa conceded that she never consulted Dr. Moffet about the appellant's bizarre behavior. She testified that she went to Dr. Moffet's office on three occasions, but never went inside because she knew the appellant "was paranoid and terrified of the power that [Dr. Moffet] had to put him away." Lisa also admitted that even prior to the robbery incident in 1993, the appellant had a sporadic work history and the couple had depended on Lisa's salary throughout most of their marriage. Lisa testified that despite numerous attempts to take his own life,

the appellant had never succeeded in even hurting himself. Lisa denied that the appellant was obsessed about putting a mobile home on his father's property; however, she conceded that she had no personal knowledge of any discussions the appellant had with his father or Lynn regarding the mobile home. Lisa recalled that on the day of the shooting, she did not see the appellant retrieve or load the rifles and she did not have any personal knowledge of the appellant's state of mind at that time. Finally, Lisa testified that although the appellant told her that he had "snapped," he did not mention hearing voices or command hallucinations when she visited him on the day of his arrest.

The next witness to testify for the defense was Dr. Eric Moffet. Dr. Moffet began treating the appellant in 1994 and at the time of trial, was still his treating psychiatrist. Dr. Moffet testified that the appellant made an appointment at his office after being unable to contact the AFG-EAP, an employee assistance program offered by Lisa's employer. The appellant had initially sought treatment through the AFG-EAP following the 1993 robbery incident. The psychiatrist at the AFG-EAP placed the appellant on Xanax; however, the appellant stopped taking the medication, fearing that he would become addicted to the drug.

Dr. Moffet testified that he first treated the appellant on August 17, 1994, approximately one year after the robbery. Based upon the appellant's recollection of the robbery, his fearful behavior since the robbery, concerns regarding profuse sweating, complaints of anxiousness and irritability, a family history of anxiety, and his social history, Dr. Moffet diagnosed the appellant as suffering from post-traumatic stress disorder (PTSD) and panic disorder. Initially, he prescribed Xanax for the appellant. Dr. Moffet related that, although the appellant had bouts of increased anxiety when facing stressful situations, overall the appellant's condition improved over the next few years. Although Dr. Moffet experimented with other anti-anxiety drugs, he concluded that Xanax was the most effective treatment for the appellant.

Dr. Moffet testified that at his May 26, 1998 appointment, the appellant's condition had worsened. The appellant reported that
> he was getting now three hours of sleep; he was going to sleep at five a.m.; he was up at eight a.m.; he could not fall asleep; his thoughts were racing; he stated to me "I'm thinking, thinking, thinking"; . . . he noticed more irritability and way too much energy; he was hyper-verbal [and] talking to others to the point where he annoys them with his talking.

Dr. Moffet decided to place the appellant on Depakote, which he explained was a mood stabilizer used to treat bipolar disorder. Dr. Moffet testified that he diagnosed the appellant as having hypomania, bipolar II disorder.

On June 2, 1998, the appellant called Dr. Moffet and informed him that the Depakote was causing severe diarrhea and light-headedness. Dr. Moffet allowed the appellant to cease taking the medication until his next appointment. At his next appointment on June 10, 1998, the appellant reported that he continued to have difficulty sleeping, irritability, high amounts of energy, and "racing thoughts." At that time, Dr. Moffet decided to try the drug Klonopin. When the appellant

-8-

did not improve, Dr. Moffet discontinued the Klonopin and again placed the appellant on Xanax and Depakote. The appellant claimed to be taking the Depakote; however, Dr. Moffet testified that "in hindsight I do not think he did." Dr. Moffet stated that the appellant "was afraid . . . that I would have him somehow locked up in an asylum for the rest of his life, so he kept things from me." The appellant's final appointment before committing the offenses was October 15, 1998. Dr. Moffet opined that the appellant was making progress on that date.

The next time Dr. Moffet saw the appellant was on television after the commission of the offenses. Dr. Moffet described the appellant as appearing "[disheveled], unkept, he just didn't look like himself." Following the appellant's arrest, Dr. Moffet received telephone calls and correspondence from the appellant and his wife, but he did not meet face-to-face with the appellant until April 28, 1999. Dr. Moffet continued the Depakote and prescribed other mood stabilizing medications, including Lithium. He also prescribed anti-psychotic medications when the appellant "would get out of touch with reality." Dr. Moffet explained that one is out of touch with reality if he is hallucinating, delusional, or paranoid.

After evaluating the appellant following his arrest, Dr. Moffet opined that the appellant was no longer hypomanic, but had become "manic with psychosis," a more severe phase of bipolar disorder. Moreover, Dr. Moffet testified that it was evident the appellant was having delusions of a religious nature and command hallucinations, which are "hallucinations that tell you to do certain things." Dr. Moffet reviewed the reports prepared by Frontier Health and Dr. Thomas Schacht, interviewed family members, and read letters written by the appellant, which Dr. Moffet described as "manic type letters." Notably, the appellant wrote one letter to Dr. Moffet in which the appellant indicated that he had been possessed by a demon that commanded him to kill his father and brother. Dr. Moffet testified that a person can be suffering from hallucinations and psychosis and, at times, appear normal. He opined that, because the appellant appeared calm upon being arrested, the appellant "was maybe still psychotic at the time but people weren't realizing it." Dr. Moffet did not find the appellant to be malingering. When asked about the appellant's mental state on December 6, 1998, Dr. Moffet opined that the appellant was suffering from bipolar disorder, manic phase with psychosis, and that the appellant was unable to appreciate the wrongfulness of his actions or form the culpable mental state required for the offenses for which he was charged.

On cross-examination, Dr. Moffet conceded that until October 15, 1998, he believed the appellant was improving. When asked if his diagnosis of hypomania at that time was inaccurate, Dr. Moffet responded that it was not. He explained that "you may have somebody who has a Bi-polar [II] illness, meaning hypo-mania and they may be in that state for years and then suddenly they will become manic or suddenly they will become psychotic and at that point their diagnosis will change." Dr. Moffet conceded, however, that the appellant never reported having any hallucinations, command or otherwise, until he was charged with the death of his father. Moreover, prior to that time, Dr. Moffet did not learn that the appellant was keeping things from him because he was afraid Dr. Moffet would institutionalize him. Finally, Dr. Moffet conceded that the only evidence of command hallucinations were reports by the appellant and his wife.

Also testifying for the defense was Dr. Thomas Schacht, a forensic psychologist and professor in the Department of Psychiatry at East Tennessee State University's College of Medicine. The defense hired Dr. Schacht to conduct a forensic evaluation of the appellant. In conducting his evaluation, Dr. Schacht interviewed the appellant on four separate occasions between November 1999 and January 2000. He also interviewed the appellant's wife, the appellant's sister, Wayne Presley, and Dr. Moffet. Dr. Schacht attempted to interview the appellant's brother, Lynn; however, Lynn did not return Dr. Schacht's phone calls. In addition to these interviews, Dr. Schacht reviewed numerous records, including the appellant's statements to Scott County and Sullivan County police officers, the appellant's school records, his medical records, a number of letters and writings by the appellant, a letter from the appellant's sister regarding their family history, and a 1974 audio tape recording of an argument between the appellant's parents. Finally, Dr. Schacht administered two psychological tests, the Minnesota Multiphasic Personality Inventory (MMPI) and the Structured Interview of Record Symptoms (SIRS), to determine whether the appellant was malingering.

At trial, Dr. Schacht concluded that the appellant's history of mental illness "extends back before the time of the alleged offense[s]. Looking at [the appellant's] life as a whole it is likely that there were forms of emotional disturbance that began in his childhood in association with domestic violence, family violence in a very dis-functional (sic) family." The appellant told Dr. Schacht that he was verbally abused by his father and witnessed his father physically abuse his mother. In order to cope, the appellant told Dr. Schacht that he would escape from his family by going to his friends' homes. The appellant further related to Dr. Schacht that he had a persistent problem with extreme sweating in high school, which Dr. Schacht opined could be "the product of living in an extremely stressful environment." Dr. Schacht testified that there were also events in the appellant's adult life which contributed to the appellant's mental disturbance, including performing poorly in college, abandoning his career in the Coast Guard after surviving a hurricane while at sea, a serious motorcycle wreck, and the 1993 armed robbery. Dr. Schacht explained that the appellant became overwhelmed with anxiety and sought treatment from Dr. Moffet. Dr. Schacht testified that although Dr. Moffet eventually diagnosed the appellant as bipolar, the appellant's treatment was not continued in the proper manner and the appellant was in a state of "decompensation" at the time he shot his father.

Dr. Schacht testified that when he questioned the appellant about the shooting, the appellant reported that when he stopped by his father's house that morning, his father came out and "blasted" him, ordering him not to visit him, Susan, Lynn, or the Scott County property. The appellant recalled that his father told him, "I've got something in there for you and for her, you know what it is." The appellant stated that his father was referring to a revolver and that after his father's comment, the appellant had a vision "of a scene from the past in which his mother had been dragged by the hair by his father with this same revolver pointed at her head and he described that . . . his mother's face interchanged and became his wife's face and his sister's face." The appellant told Dr. Schacht that he then had an out-of-body experience in which a voice commanded him to "go . . . get your guns, get a sledge hammer." When the appellant returned to his father's house, the voice ordered him to break down the door and kill his father. The voice then commanded him to go to his brother's home, kill his brother, and then kill himself. However, when his brother confronted him

and called his name, the voice vanished. The appellant compared this experience to a camera recording an event, but having no will to stop it. Dr. Schacht testified that he asked the appellant if, at the time, he was aware of whether his acts were right or wrong. The appellant responded that "[f]rom the observer's point of view, from the part of me that was back there like a camera, right or wrong didn't exist, it was just watching and documenting."

Dr. Schacht diagnosed the appellant as bipolar with "mood-congering psychotic features" and opined that the appellant was suffering from this severe mental disease or defect at the time of these offenses. Dr. Schacht further opined that the appellant was unable to appreciate the wrongfulness of his actions at that time. Dr. Schacht testified that the MMPI and SIRS testing indicated that the appellant was not malingering.

On cross-examination, Dr. Schacht testified that he did not meet with the appellant until November 30, 1999, nearly one year after the shooting. Dr. Schacht conceded that over the period of a year, one's mental status could change or one could form a defense strategy. Dr. Schacht acknowledged that, when interviewing the appellant, Dr. Schacht and the appellant did not discuss the period following the appellant's arrest, but rather focused upon the appellant's state of mind at the time of the offenses. Dr. Schacht conceded that the appellant admitted he lied to the Naval psychiatrist in order to be discharged from the Coast Guard. Moreover, in spite of all the appellant's alleged suicidal episodes, Dr. Schacht could point to no evidence that the appellant ever succeeded in injuring himself.

Dr. Schacht conceded that he never spoke with the police officers or jailers who came into contact with the appellant, nor did he speak with Stacy Cox who interviewed the appellant within days of his arrest. However, Dr. Schacht testified that he did review Cox's evaluation of the appellant. Dr. Schacht stated that although he could not recall the contents of the appellant's letters to his father, he did remember the appellant writing about his father's property and a mobile home. Dr. Schacht testified that he did not ask the appellant whether the voice commanded him to tell Wayne Presley on the day of the shooting that "Susan can have it all." Although Dr. Schacht had previously testified that the appellant "snapped out of it" when he heard his brother's voice, Dr. Schacht agreed that the appellant may have snapped out of it because he was "looking down the wrong end of a gun." Finally, Dr. Schacht conceded that one could interpret the appellant's request for his brother to kill him and his statement to officers to "treat me as the murderer I am" as evidence that the appellant was able to appreciate the wrongfulness of his acts.

J.M. Baker, a long-time friend of the appellant, testified that he had known the appellant for eighteen to twenty years and that they were the "best of friends." Baker described the appellant as a "great, fun loving, wonderful person" and stated that he had never witnessed the appellant behaving strangely prior to the shooting. However, Baker testified that when he went to visit the appellant at the Scott County jail several days after the shooting, the appellant looked like "a totally different person." According to Baker, the appellant appeared depressed and confused and his speech was "disconnected with reality." Baker testified that he visited the appellant on several occasions at the Scott County jail and later at the Sullivan County jail. Baker indicated that the

appellant improved with each visit, describing the appellant as "coming back to reality." On cross-examination, Baker admitted that the appellant had never told him that he had experienced hallucinations. Baker also conceded that, while visiting the appellant in jail, the appellant made a point of telling Baker that he had lost touch with reality.

Also testifying for the defense was Dr. Tony Gonzales, pastor of Stateline Missionary Baptist Church in Kingsport, Tennessee. Dr. Gonzales testified that he had been the pastor at Stateline for forty years. Dr. Gonzales stated that the appellant's wife had attended his church "most of her life" and that he had known the appellant for twenty years. Dr. Gonzales described the appellant as a "quiet gentleman" with a "meek spirit." When asked if he had ever witnessed the appellant behaving strangely, Dr. Gonzales responded that in the fall of 1998 he was teaching a Sunday school class when the appellant and Lisa walked in and sat down. According to Dr. Gonzales, the appellant was talking loudly and disrupting the class, which behavior was totally out of character for the appellant. Dr. Gonzales told the appellant to be quiet and the appellant responded, "Yes sir." The appellant then hung his head for the remainder of the class and at all subsequent church services. Dr. Gonzales testified, "That's the only time that I've ever witnessed anything like that out of [the appellant]."

On December 6, 1998, Dr. Gonzales went to the Scott County jail to visit the appellant. Dr. Gonzales recalled that the appellant "had a very wild look [in] his eyes." The appellant told him that "the demons of hell were talking to him and . . . he only obeyed the voice of Satan." According to Dr. Gonzales, the appellant did not show any remorse at that time, "except that he cried and was concerned about God's forgiveness." Dr. Gonzales also testified that when he placed his hand on the appellant's hand, he noticed that the appellant's palm was sweating profusely. Approximately two weeks later, Dr. Gonzales visited the appellant a second time at the Scott County jail. Dr. Gonzales recalled that the appellant appeared calmer and asked, "Pastor would you believe me if I told you that God has commissioned me and commanded me like he did Moses and I have a mission to accomplish here on earth and I must get the word of God out." Dr. Gonzales visited the appellant once more after the appellant was transported to the Sullivan County jail. Dr. Gonzales testified that the appellant was "a much calmer person" and was starting to look "more like the Roger I knew from church."

On cross-examination, Dr. Gonzales conceded that his contact with the appellant during the past twenty years had been limited to Sunday church services. Dr. Gonzales testified that he had never visited the appellant outside of church prior to visiting him in jail, nor had he ever counseled the appellant. Dr. Gonzales agreed that when he visited the appellant immediately following his arrest, he believed that the appellant "was a man professing his sins and asking for forgiveness."

The final witness for the defense was the appellant's sister, Susan Quillen Presley. Susan described the appellant as "kind of peculiar . . . [with] an odd sense of humor." She explained that the appellant was a gentle person, neither aggressive nor violent. When asked to describe the appellant's relationship with his father, Susan testified that, although she could not recall any

arguments between the two, the appellant "got on dad's nerves." Susan testified that her father was nice to her and Lynn, but he was not kind to the appellant, often referring to the appellant as a "long-neck" or a "G– d— Anderson."[2] According to Susan, the appellant desired to have a relationship with his father, but his father did not return those feelings.

Susan testified that her father often fought with her mother, describing her father as a "shover and a pusher and a hair dragger when he was mad." Susan testified that after her brothers moved out of the house, she told her mother that she could no longer tolerate the arguing, and in 1986 she and her mother moved to the house on Bloomingdale Pike. However, a short time later, her mother was diagnosed with cancer and her father moved in to take care of her. Susan testified that her father was "real good" to her mother until her death three months later. After her mother's death, her father continued to live in the house on Bloomingdale Pike.

Susan next described instances in which she observed the appellant exhibit strange behavior. She stated that the first incident occurred approximately two years before the offenses. Susan testified that the appellant called her and in a deep voice said, "My sister I need you to come, come, come to my house, we must pray. We must pray for Lynn and dad's salvation." Susan related that she and Wayne reluctantly went to the appellant's house where the appellant was waiting outside in the cold to welcome them. Susan testified that the appellant "led me by my hand and he was shaking and he was holding it tight and he said, 'Come, come and sit at mother's table.' . . . And we sat down and there was candles and he started praying out loud and crying and acting strange and weird." Susan also testified that after that incident, the appellant began to preach Bible numerology. One such experience occurred when Susan visited the appellant at the Scott County jail. Susan testified that the appellant's "eyes were dancing" and he was demanding that Susan "take heed." Susan testified that her brother was not acting like himself and she was "scared for him."

On cross-examination, Susan conceded that, prior to his father's death, the appellant wanted to place a mobile home on his father's property in Scott County. Susan testified that the property was to be divided among the children upon their father's death. Susan conceded that her father would not allow the appellant to place the mobile home on the property and the appellant did not want to wait until his father's death. Susan testified that the appellant would anger their father by asking about the property. Indeed, Susan stated that she was "the mediator" between the two men because her father did not want to discuss the property with the appellant. Susan testified that over the years, the appellant never told her that he had experienced hallucinations.

The State presented the following witnesses in rebuttal: James Lawson and William "Bud" Flanery, jailers at the Scott County jail in December 1998; Dr. James Turnbull, a forensic psychiatrist; and Stacy Cox, a licensed professional counselor. James Lawson testified that in December 1998, he was employed as a jailer for the Scott County Sheriff's Department. One of his duties as a jailer was to make "rounds" to check on the inmates. Lawson testified that on December

---

[2] The appellant's mother's maiden name was Anderson. Because of the appellant's physical resemblance to his mother, his father often called him by that name.

16, the appellant was in the holding cell when he lifted a noose made of shoestrings and told Lawson, "You need to remember this." Lawson confiscated the shoestrings and recorded the event in the incident book. On another occasion, the appellant asked Lawson to call Scott County Mental Health. Lawson described the appellant as "calm" and "a normal inmate." Lawson testified that the appellant never made any statement regarding hallucinations, the Bible, or numbers. On cross-examination, Lawson conceded that his encounters with the appellant were brief.

Also testifying for the State was William "Bud" Flanery, a retired jailer for the Scott County Sheriff's Department. Flanery was employed by the Department for twenty-three years and was chief jailer in December 1998. Flanery testified to an incident on December 11, 1998, in which the appellant feigned losing consciousness. Flanery was dispensing medication to the inmates when he came to the appellant's cell. The appellant refused his medication and told Flanery that he needed to go to the emergency room because he could not sleep. Flanery agreed to call "mental health" and returned to the office to record that the appellant had refused his medication. At that time, a trustee knocked on the office door and Flanery and the trustee returned to the appellant's cell. Flanery observed the appellant "laying on his left side piled up in the floor." Flanery ordered the other jailer to call the "life saving crew" and two paramedics arrived five minutes later. One of the paramedics placed an ammonia capsule under the appellant's nose and the appellant "jerked his head up and he shook it a little bit and he laid it back down." The paramedic placed the capsule under the appellant's nose a second time, but the capsule had "run out." The paramedic took another ammonia capsule and, without breaking it open, placed the capsule under the appellant's nose. The appellant again "jerked his head up and shook his head and laid his head back down." The paramedic showed Flanery the unopened capsule. Other than this incident, Flanery testified that the appellant appeared to be normal and never mentioned any hallucinations or religious numbers.

Dr. James Turnbull, a forensic psychiatrist and medical director at Frontier Health, testified next for the State. On January 27, 1999, Dr. Turnbull evaluated the appellant at the request of the court to determine whether there was support for the insanity defense. Dr. Turnbull first obtained a social history from the appellant in which the appellant related to Dr. Turnbull that

> his father had a bad temper and that he drank some when he was younger. [The appellant] related that his parents however got along fine and stated that he was closer to his mother than his father. [The appellant] related that he got along well with his siblings and denied any significant difficulties. . . . [The appellant] earned his real estate license [] in the 1980's and apparently by his report did well enough to retire at the age of thirty-seven (37) from real estate. [The appellant] described himself as an entrepreneur who has generally done well in business. . . . [The appellant] related that he had been seeing a psychiatrist since he was robbed in his real estate office and described himself as nervous. . . . [The appellant stated] that he sees Dr. Gary Bush and is also seeing Dr. Eric Moffet who has diagnosed him by his report as having bipolar disorder. [The appellant] was also diagnosed in the past . . . as having a panic disorder.

Based on this social history, the appellant's mental status evaluation, and the appellant's statement to police the day he was arrested, Dr. Turnbull initially diagnosed the appellant as having "an adjustment disorder with depressed mood . . . [where] you get depressed as a result of your situation." Dr. Turnbull determined that the appellant was not suffering from a severe mental disease or defect at the time of the offenses and was able to appreciate the wrongfulness of his actions.

On October 9, 2000, at the request of the court, Dr. Turnbull performed a second evaluation to determine whether the appellant suffered from a diminished capacity at the time of the offenses. In addition to the data obtained at the previous evaluation, Dr. Turnbull also considered the reports of Dr. Schacht and Dr. Moffet, the results of evaluations performed by counselor Stacy Cox, writings of the appellant, notes of the jailers, the 1974 audio tape, and a second interview with the appellant. Based upon this additional information, Dr. Turnbull changed his diagnosis of the appellant to bipolar disorder. However, Dr. Turnbull testified that his new diagnosis did not affect his prior findings regarding the appellant's ability to appreciate the wrongfulness of his acts. Dr. Turnbull testified that, although he now concluded that the appellant was suffering from a severe mental disease or defect and diminished capacity at the time of the offenses, in his opinion the appellant was able to appreciate the wrongfulness of his actions and to form the requisite culpable mental state to commit the offenses. Dr. Turnbull further opined that it was unusual for an individual to experience a command hallucination on only one occasion.

On cross-examination, Dr. Turnbull conceded that at the second interview, the appellant retracted the statement that he had a happy childhood. Dr. Turnbull opined that he did not find the appellant to be malingering and had no reason to doubt that the appellant had experienced hallucinations and delusions. Dr. Turnbull then testified that in over twenty years of practice, he had never had a patient who was experiencing command hallucinations carry out an order to kill another. However, he agreed that "it's certainly happened." When asked if patients often hide information from their psychiatrists, Dr. Turnbull responded that although it was possible, "[i]t's relatively rare because most of the people who come to see me are coming for help." Dr. Turnbull testified that individuals may, as a result of severe stress, go into a dissociative state in which they experience an out-of-body experience, but otherwise appear normal.

The State's final rebuttal witness was Stacy Cox, a licensed professional counselor with the Scott County Mental Health Center whose duties included treating the inmates at the Scott County jail. Cox testified that he first counseled the appellant at the Scott County jail on December 11, 1998. The appellant's chief complaint was that he was anxious and having difficulty sleeping. Cox testified that the appellant appeared to be "oriented" and the appellant did not report any delusions or religious ideations. Cox determined that the appellant did not require hospitalization at that time.

Cox returned to the jail on December 15, 1998. At this session, the appellant immediately began discussing "religious ideation and the numbers stating that . . . 3 and 7 were the numbers of God and 6 was the number of the devil." The appellant also stated that he "must have been under demonic possession when he killed his father" and that Cox "must think that he is

delusional or psychotic." Cox testified, however, that he found these comments to be unusual because individuals generally do not admit to being delusional or psychotic. Cox also testified that the appellant admitted that he was attempting to manipulate Cox. On cross-examination, Cox conceded that in assessing the appellant, he did not contact Dr. Moffet or Dr. Turnbull. Cox opined that the appellant was not malingering.

The jury convicted the appellant of aggravated burglary, felony murder, premeditated first degree murder, and simple assault, thereby rejecting the defense of insanity. The trial court merged the convictions for premeditated first degree murder and felony murder. The appellant received a life sentence for the first degree murder and the trial court sentenced the appellant to four years incarceration for the aggravated burglary and eleven months and twenty-nine days in the county jail for the assault. The trial court ordered that the sentences be served concurrently for an effective life sentence. Again, the sole issue on appeal is whether the appellant proved by clear and convincing evidence that he was legally insane at the time of the commission of the offenses.

## II. Analysis

The defense of insanity became an affirmative defense effective July 1,1995. The current insanity statute provides:

> It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

Tenn. Code Ann. § 39-11-501(a) (1997). Evidence is clear and convincing when "there is no serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence." State v. Holder, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999).

In determining the issue of insanity, the jury may consider both lay and expert testimony and may discount expert testimony which it finds to be in conflict with the facts of the case. State v. Sparks, 891 S.W.2d 607, 616 (Tenn. 1995). Moreover, where expert testimony conflicts with testimony as to the facts, the jury is not required to resolve the conflict in favor of the expert testimony, but must determine the weight and credibility of each in light of all the facts and circumstances of the case. Holder, 15 S.W.3d at 912. In determining a defendant's mental state at the time of the alleged offense, the jury may consider "evidence of his actions and words before, at, and immediately after the commission of the offense." Id.

Our supreme court recently set forth the parameters of appellate review of issues involving an insanity defense. State v. Christopher M. Flake, No. W2000-01131-SC-R11-CD, 2002 Tenn. LEXIS 375, (Jackson, Aug. 29, 2002) (publication pending). The court unanimously concluded that "appellate courts in Tennessee should apply the reasonableness standard when reviewing a jury's rejection of the insanity defense." Id. at *38-39. In other words, an appellate

court should reverse a jury verdict rejecting the insanity defense "only if, considering the evidence in the light most favorable to the [State], no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence." Id. at *39. The court found this standard to be properly deferential to the jury's finding, without completely insulating such finding from appellate review. Id. The court noted that this standard "enhances appellate review by virtue of its similarity to the familiar sufficiency standard which appellate courts are accustomed to applying." Id.

Considering the evidence in this record in the light most favorable to the State, we conclude that a reasonable trier of fact could have found that the appellant failed to establish by clear and convincing evidence that, as a result of a severe mental disease or defect, he was unable to appreciate the nature and wrongfulness of his acts. Although the parties agreed that the appellant was suffering from bipolar disorder at the time of the offenses, mental disease or disorder alone is not sufficient. To establish the affirmative defense of insanity, the appellant must show that as a result of mental disease or disorder, he was unable to appreciate the nature or wrongfulness of his acts. The appellant argues that the overwhelming weight of the evidence showed that the appellant was not able to appreciate the wrongfulness of his acts on December 6, 1998. We disagree.

The record contains ample evidence from which the jury could have concluded that the appellant appreciated the wrongfulness of his acts on the day of the offenses. First, Deputy Whitt testified that as she was placing handcuffs on the appellant, the appellant told her to "go ahead and treat me as the murderer I am . . . do whatever you need to, I know I am probably going to hell, I will probably die of lethal injection." This statement demonstrated that the appellant was aware that he had committed a crime and that there would be consequences for his actions. Second, the record reflects that, after Lynn confronted the appellant on the morning of the offenses, the appellant begged Lynn to "take him outside and shoot him." Defense expert Dr. Schacht conceded on cross-examination that the appellant's request for Lynn to kill him, as well as his statement to Deputy Whitt, could be interpreted as evidence that the appellant appreciated the wrongfulness of his acts. Next, Dr. Gonzales testified that when he visited the appellant in jail on the day he was arrested, Dr. Gonzales believed that the appellant "was a man professing his sins and asking for forgiveness." There was also evidence that the appellant never reported experiencing hallucinations prior to, or on the day of, his arrest. Moreover, because his father would not allow him to place a mobile home on the Scott County property, the appellant had a motive to shoot his father. Finally, the State offered the expert testimony of Dr. Turnbull, who opined that the appellant was able to appreciate the wrongfulness of his act at the time of the offenses. Dr. Turnbull further testified that the appellant had the ability to act intentionally and with premeditation. Applying the reasonableness standard of review, a standard deferential to the trier of fact, we are unable to conclude that no reasonable trier of fact could have failed to find that the appellant's insanity at the time of the offenses was established by clear and convincing evidence.

### III.  Conclusion

Accordingly, we affirm the judgment of the trial court.


        _____

        NORMA McGEE OGLE, JUDGE