# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
July 19, 2006 Session

## STATE OF TENNESSEE v. JAMES TIMOTHY TAYLOR

**Direct Appeal from the Circuit Court for Robertson County**
**No. 04-0315     John H. Gasaway, III, Judge**

---

**No. M2005-01878-CCA-R3-CD - Filed August 25, 2006**

---

The defendant, James Timothy Taylor, was convicted in a Robertson County bench trial of one count of passing a forged check, a Class E felony, and sentenced as a Range I, standard offender to two years in the Department of Correction. On appeal, he contends that the evidence was insufficient to sustain his conviction and that the trial court erred by admitting into evidence a copy of the original check. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, J., and J.S. DANIEL, SR. J., joined.

Charles S. Bloodworth, Assistant Public Defender, Springfield, Tennessee, for the appellant, James Timothy Taylor.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On July 27, 2004, the Robertson County Grand Jury indicted the defendant on one count of forgery based on his having passed a stolen unemployment check at the Westside Phillips 66 station in Springfield. The State's first witness at the defendant's February 9, 2005, trial was the payee on the check, William Bush, who testified that he contacted the state unemployment office when his unemployment check did not appear in his Springfield post office box as scheduled in May 2004. He said that the unemployment office informed him that the check had already been cashed and, at his request, sent him a copy. Bush testified that the check had been endorsed by a "David," with a last name he could not make out, and paid by the "Westside 66, 1220 Fifth Avenue West" in

Springfield. He said he had never patronized the store, which was located on the opposite side of town from where he lived at that time. He identified a copy of the check, which was subsequently admitted for identification. Bush stated that he gave the copy of the check to the Springfield Police Department when he filed a report on the incident. He said that, in addition to contacting the police, he also went to the Westside 66 store and spoke with a man with a foreign name, who confirmed that the store had cashed the check. Bush further testified that he did not know the defendant and had never authorized him to cash the check.

Mustafa Albadran, the owner and operator of the Westside 66 Market, testified that the defendant, a regular customer of the store, told him the check was his and gave it to him as payment for work he had performed on the defendant's vehicle. He could not remember the exact cost of the repair work but recalled that he gave the defendant approximately $90 or $100, the difference between the $189 check and the cost of the automotive repair. He said he was busy at the time and did not notice that the check was not made out to the defendant. He further stated that the check was already endorsed when the defendant gave it to him and, other than checking to see that it was signed, he did not pay attention to the signature. When questioned in court, he said that the signature appeared to be "David McCall" or something similar. He identified the defendant in the courtroom as the man who passed him the check and testified that he saw him in his store two or three times each week but knew him only by the nickname "Greedy Man." He said he did not ask to see the defendant's driver's license because the defendant was a regular customer and he felt comfortable accepting his check.

Albadran testified that the first person who later contacted him about the check was Bush, who showed him a copy and asked where he had gotten it. He said he did not recognize the check at that time and told Bush that he would need to check with his bank. He stated that a police detective came to talk to him about the check later that same afternoon and then returned a second time with a photographic lineup, from which he identified the defendant. Albadran testified he had no hesitation in identifying the defendant, either from the photographic lineup or in the courtroom, as the man who passed him the check. He stated that he had lost money twice in connection with the incident because the bank had deducted the amount of the check from his account and he was also out the cost of the repair work he performed on the defendant's vehicle.

Detective David Joyce of the Springfield Police Department testified that when he asked Albadran if he remembered the check, he told him that he did and that a man he knew as "Greedy Man" had given it to him as payment for some brake work on his car. Detective Joyce stated that he knew the defendant's nickname was "Greedy Man," and the next day he returned to the store with a photographic lineup, from which Albadran picked out the defendant's photograph. Detective Joyce identified the copy of the check, previously marked as Exhibit A, and said that it was a correct copy of the copy that Bush had given him. He testified that, beginning in June, he had attempted several times to get the original check, calling two or three different telephone numbers and speaking to six to eight people at the Department of Labor and Workforce, but had been given the "run around" and was ultimately unsuccessful. He acknowledged that, as a consequence, he had been unable to conduct fingerprint or handwriting analysis on the original check.

Freida Begarly testified that she was a benefit auditor with the Department of Labor and Workforce Development and investigated fraudulent unemployment and insurance benefit claims. According to her records, Bush completed an affidavit on June 16, 2004, stating that he had not received the unemployment check that had been issued to him on May 31, 2004. Begarly described the procedure employed by her office in investigating fraudulent check claims and said that, as part of her investigation, she receives not the original, but instead a copy of the check from the Treasury Department. She testified that the original checks are kept for sixty days, microfilmed, and then destroyed.

Begarly testified that she received a copy of the check from her supervisor, obtained by her from Sheila Johnson, an employee of the Cashier's Unit whose job responsibilities included obtaining copies of requested checks. She identified Exhibit A as a copy of the check, which had been faxed to her the previous day, and said that it was identical to the copy of the check she had received from her supervisor. At that point, ruling that Begarly's testimony was sufficient to authenticate the document, the trial court admitted Exhibit A into evidence. On cross-examination, Begarly acknowledged that it was not possible to "do a handwriting sample based on [the] copy," or to tell what color ink had been used to endorse the check.

The defendant, testifying in his own behalf, denied that he had forged the check, stating that he did not know Bush, had no access to his post office box, did not know anyone by the name of David "Nicole," "Micole" or "McCall," and had never seen the original check. He said he had not owned a vehicle since 1991 and had never had brake work performed on anyone else's vehicle. He stated, however, that he was well-acquainted with Albadran, who, according to his testimony, regularly dealt in stolen property at his store. The defendant testified that he had introduced Albadran to "Robert," a crack cocaine user, and that Albadran usually bought anything that Robert brought to him regardless of whether the property was stolen. On cross-examination, the defendant acknowledged that he was known by the nickname "Greedy Man."

In rebuttal, the State recalled Detective Joyce, who testified that he had investigated the Westside Phillips 66 more than a year prior to trial in connection with a report that the store might contain stolen property. He stated that he did not, however, find the stolen item in the store or see any other items that he believed to have been stolen. He further testified that, to his knowledge, Albadran was not suspected by anyone in his department "of being a fence."

## ANALYSIS

### I. Admission of Copy of Check

The defendant first contends that the trial court erred in admitting "a facsimile of a photocopy of a microfilm" of the check into evidence, arguing that the State's failure to obtain and produce the original check, which precluded him from conducting fingerprint and handwriting analysis on the document, rendered his trial fundamentally unfair. The State argues, *inter alia*, that the trial court properly admitted the copy as an authenticated duplicate of the original. We agree with the State.

On appeal, the defendant cites State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), among other cases, to argue that the State's failure to produce the original check resulted in a trial that was fundamentally unfair. However, we find Ferguson inapplicable to the case at bar. In Ferguson, our supreme court adopted a balancing approach for courts to use to determine when the State's loss or destruction of evidence has deprived a defendant of his fundamental right to a fair trial. Id. at 917. Under this approach, a court must first determine whether the State had a duty to preserve the evidence. Id. If so, the court next considers several factors, including the degree of negligence involved in the destruction of the evidence and the importance of the evidence, to determine whether the missing evidence resulted in a trial that was fundamentally unfair to the defendant. Id.

This case differs markedly from the situation in Ferguson, in which the evidence in question was an arresting officer's videotape of a defendant's sobriety test. As a general rule, "the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. (footnote omitted). This includes "books, papers, documents, photographs, tangible objects, . . . which are within the possession, custody or control of the State . . . ." Tenn. R. Crim. P. 16(a)(1)(C). Here, it was undisputed that neither the police department nor the attorney general's office was ever in possession of the original check. Moreover, although the defendant suggests otherwise, there was no indication that Detective Joyce did not make a good faith effort to obtain the original, which, as Begarly explained, was destroyed by the Treasury Department pursuant to regular business practices. Detective Joyce testified that he made his first attempt to obtain the original check in June 2004. Thus, there was no evidence that he deliberately delayed his investigation until after the check had been destroyed.

Under the Tennessee Rules of Evidence, a "duplicate," defined in part as "a copy produced by . . . techniques which accurately reproduce the original," Tenn. R. Evid. 1001(4), "is admissible to the same extent as an original unless a genuine question is raised as to the authenticity of the original." Tenn. R. Evid. 1003. We note that the defendant makes no argument on appeal against the check's authenticity and raised no genuine issue as to its authenticity at trial, instead primarily complaining about the quality of the copy. In ruling that the copy was admissible, the trial found that Begarly had the expertise, background, training, and knowledge "to testify that the document, . . . marked as Exhibit A, is what it is claimed to be and that is a check from the Department of Labor." We find no error in this ruling and, therefore, conclude that the defendant is not entitled to relief on this issue.

## II. Sufficiency of the Evidence

The defendant also contends that the evidence is insufficient to sustain his conviction. However, he makes no specific argument on this issue, instead merely referring this court to the record as a whole. The State responds by arguing that the defendant has waived the issue for failing to provide argument or citations to the record. The State further argues that the trial court acted within its province in accrediting the testimony of the witnesses for the State over that of the defendant.

We agree that the defendant has waived appellate review of this issue by his failure to provide argument or appropriate citations to the record. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) ("The brief of the appellant shall contain . . . [a]n argument . . . with citations to the authorities and appropriate references to the record[.]").

Regardless of the waiver, we conclude that the record contains ample evidence in support of the defendant's conviction. The verdict of a trial judge in a bench trial is entitled to the same weight on appeal as a jury verdict. See State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999). When the sufficiency of the convicting evidence is challenged, the relevant question we must consider is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

Tennessee Code Annotated section 39-14-114, the "Forgery" statute, provides in pertinent part:

> (a) A person commits an offense who forges a writing with intent to defraud or harm another.
>
> (b) As used in this part, unless the context otherwise requires:
>
> (1) "Forge" means to:
>
> (A) Alter, make, complete, execute or authenticate any writing so that it purports to:
>
> (i) Be the act of another who did not authorize the act;
>
> . . . .
>
> (C) Issue, transfer, register the transfer of, pass, publish, or otherwise utter a writing that is forged within the meaning of subdivision (b)(1)(A)[.]

Tenn. Code Ann. § 39-14-114(a), (b)(1)(A)(i), (C) (2003).

In reaching its guilty verdict, the trial court, noting that whether the State had proved the elements of the crime turned on Albadran's testimony, observed that there was nothing in his demeanor and no other evidence besides the defendant's testimony to suggest that Albadran was lying. Thus, the trial court specifically accredited the testimony of Albadran over that of the defendant. As the State points out, this credibility determination was within the province of the trial court as the trier of fact.

## CONCLUSION

We conclude that the trial court properly admitted the copy of the check into evidence and that the evidence is sufficient to sustain the conviction. Accordingly, we affirm the judgment of the trial court.

                               _____

                               ALAN E. GLENN, JUDGE