IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 10, 2015 Session Heard at Greeneville[1]

## DORIS A. WHALEY v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Washington County**
**No. 37706     Robert E. Cupp, Judge**

_____

**No. E2014-02378-CCA-R3-PC – Filed May 13, 2016**

_____

The Petitioner, Doris A. Whaley, appeals the Washington County Criminal Court's denial of her petition for post-conviction relief from her conviction of first degree premeditated murder and resulting life sentence. On appeal, the Petitioner contends that she received the ineffective assistance of counsel because trial counsel failed to present medical evidence that would have shown she was physically incapable of killing the victim. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Mark A. Fulks (on appeal) and Dustin Jones (at evidentiary hearing), Johnson City, Tennessee, for the appellant, Doris A. Whaley.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Anthony Wade Clark, District Attorney General; and Dennis Brooks and Erin McArdle, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

---

[1] Oral argument was heard in Greeneville as part of this court's Criminal Appeals Civics Education for Students project.

In the early morning hours of August 28, 2006, police officers responded to a 9-1-1 emergency at the Petitioner's home. When the first officer arrived, he found the distraught Petitioner standing on the front porch and the thirty-seven-year-old victim, who was the Petitioner's boyfriend, lying on the living room floor. The Petitioner had blood on her hands, right leg, and shorts; the living room was in disarray; and an open, folding knife with blood half-way up the blade was on a coffee table. The victim had defensive wounds on his hands and arms and had been stabbed thirty times. He later died at a hospital. The front door to the home had been broken open, and the Petitioner claimed she had been downstairs "shooting pool" when she heard a loud noise, went upstairs, and found the victim. At first, the Petitioner was not a suspect in the stabbing. However, the Petitioner's story changed repeatedly so that the police began to suspect her in the victim's death. See State v. Doris Ann Whaley, No. E2010-00389-CCA-R3-CD, 2011 WL 2519762, at *1-4 (Tenn. Crim. App. at Knoxville, June 23, 2011).

The Petitioner's thirty-two-year-old son, Howard Shyane Paul, testified at trial for the State that he arrived at the Petitioner's house in the early morning hours of August 28 and found the door locked, which was unusual. He looked through the blinds and saw the Petitioner and the victim on the floor. Paul kicked open the door, saw the Petitioner "'just kind of scrunched down and leaned over,'" and saw the victim lying on the floor. The Petitioner asked that Paul help her, and Paul told her, "'Momma, honey, I love you, but I can't help you.'" The Petitioner had a weapon in her hand, but Paul could not tell if it was a knife. Paul, who was on parole, fled from the scene because he did not want to go back to prison. Paul considered taking the blame for the victim's death but later implicated the Petitioner. See id. at *5.

Crystal Hensley, who had two children with the victim, testified that two days before the victim's death, the victim came to her home. Paul arrived and spoke harshly to the victim, and the victim left with Paul. Hensley acknowledged that the victim was afraid of Paul and said that she was concerned for the victim. About 3:00 a.m. on August 28, the victim telephoned Hensley and asked her to come and get him at the Petitioner's house. Hensley could hear the Petitioner screaming and cursing at the victim, who was hiding under a porch. The Petitioner told the victim that she wanted her telephone and that he was "a dead mother[f***er]" if he did not bring it to her by the time she counted to three. Hensley heard the Petitioner count to three. By that time, the victim had moved from underneath the porch and was hiding under a truck. He then told Hensley, "'I'm just going to sit down in the truck. . . . What's she going to do?'" Hensley later learned that the victim had been killed. See id. at *6-7.

The jury convicted the Petitioner as charged of first degree premeditated murder. On direct appeal of her conviction to this court, the Petitioner argued, in pertinent part,

that the evidence was insufficient to support the conviction. In finding the evidence sufficient, this court stated as follows:

> Taken in the light most favorable to the State, the evidence shows that on the night of August 27, 2006, the appellant and the victim returned a lawnmower to a home on Watauga Road and returned to the appellant's home on Furnace Road. About 11:00 p.m., the appellant telephoned Crystal Hensley and told her to come get the victim because he was intoxicated. At 3:00 a.m., the victim telephoned Hensley and told her that he and the appellant had been drinking and arguing. Hensley could hear the appellant screaming and cursing at the victim. The appellant demanded that the victim, who was hiding under the porch from the appellant, return her telephone or she was going to kill him. When the victim did not return the phone to the appellant by the time she counted to three, the appellant said, "You're dead, mother[f***er]." The victim, who had moved from underneath the porch to underneath a pickup truck, told Hensley that he was going to quit hiding and sit in the truck. Shortly after the victim's telephone conversation with Hensley, Shyane Paul returned home. When he could not get into the appellant's house, he looked through a window and saw the appellant on the floor with the victim. Paul kicked open the front door, saw the appellant holding a knife, and saw the victim lying in a pool of blood. The victim had been stabbed thirty times. The appellant gave numerous, conflicting accounts of what transpired in the early morning hours of August 28, 2006, and the defense cross-examined Paul and many other witnesses extensively about Paul's possible involvement with the victim's death. The jury determined that the appellant killed the victim. The identity of the appellant as the person who committed the crime was a question of fact for the jury. See State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The evidence is more than sufficient to support the appellant's conviction for first degree murder.

Id. at *12.

After our supreme court denied the Petitioner's application for permission to appeal, she filed a timely pro se petition for post-conviction relief. In the petition, the Petitioner alleged that she received the ineffective assistance of counsel because trial counsel failed to challenge the trial court's ordering Paul to testify against her or the trial court's ruling that the State could play a secretly-recorded conversation between the Petitioner and Paul's girlfriend. The post-conviction court appointed counsel, and counsel filed an amended petition, alleging for the first time that trial counsel also was ineffective because he failed to present evidence that the Petitioner had been declared disabled prior to the victim's death and that "it would have been highly improbable for Petitioner to have [committed] the stabbing altogether, but perhaps more improbable that Petitioner could have [committed] the stabbing without suffering injury to herself and specifically to her hands."

At the evidentiary hearing, trial counsel testified for the Petitioner that he was appointed to represent her in September 2007 and had been practicing law thirty-three years at the time of her trial in January 2009. Counsel said that he had "a lot of time" to prepare for trial and obtained an investigator for the case. The investigator was responsible for finding witnesses and acquiring their statements and was "very good." Counsel said that the defense obtained the Petitioner's medical records because "[w]e were looking at her carpal tunnel" and that he probably was aware she had been declared disabled by the Social Security Administration (SSA). At that point, post-conviction counsel introduced into evidence an SSA document dated March 10, 2006, in which the SSA found that the Petitioner

> has the following severe impairments: history of bilateral carpal tunnel syndrome, with continuing osteoarthritis of the right thumb and CMC joint; neck and left shoulder pain; recent white blood cell count elevation; chronic obstructive pulmonary disease, with shortness of breath; bilateral lower extremity edema; lumbar back pain with radiation down the left leg; uncontrolled hypertension; chronic anxiety; and chronic arthritis . . . .

Counsel said that his investigator spoke with one of the Petitioner's physicians and was supposed to speak with her second physician. However, counsel did not know if the investigator ever did so.

Post-conviction counsel asked why trial counsel did not present evidence about the Petitioner's medical conditions at trial, and trial counsel stated as follows:

- 4 -

> I had talked to the [medical examiner] asking him if the wounds would show [inflicted] by right-hand, left-handed person. He said he couldn't tell. I said -- talked to him, I said, look, she had carpal tunnel, you know, would she be able to stab somebody thirty-some times. And he -- he basically said the knife does the stabbing, that it wouldn't take much to hold onto a knife. And that's -- that's the context I remember talking to the man who performed the autopsy.

The medical examiner never reviewed the Petitioner's medical records, and counsel did not have the Petitioner examined by another physician who could have testified at trial that she was unable to commit the crime. Counsel explained that he saw the Petitioner every day, that she drove herself to his office, and that she could carry drinks. Moreover, the Petitioner's hands were not "stiff," she did not complain of pain, and counsel never saw anything in the autopsy report to make him think she was incapable of stabbing the victim. Counsel stated that his goal "was to show that [Shyane] Paul did it" and that "if a doctor said somebody with two carpal tunnel surgeries couldn't hold a knife period then I would have pursued it, but nobody said that."

Trial counsel acknowledged that the medical examiner testified at trial that the victim was five feet, three inches tall. Counsel said, "Somehow I think it came to . . . light during trial that that was a mistake." Trial counsel said he "wanted to clear up the mistake" and called the Washington County Criminal Court Clerk to testify that according to an arrest warrant for the victim, the victim was six feet, one inch tall. However, the arrest warrant was dated June 7, 2007, ten months after the victim's death. Counsel said that he did not look at the warrant himself and that the date stated by the clerk was probably an error but that "that's how it went to the jury."

On cross-examination, trial counsel testified that the Petitioner's case was not his first murder case and that he had defended five to ten people in murder cases at the time of trial. He said the Petitioner told him that she had carpal tunnel syndrome but never told him that she could not grasp a knife. On redirect examination, trial counsel acknowledged that the victim had defensive wounds consistent with struggling with his attacker.

Tracy Harris testified that she had been friends with the Petitioner for about twenty-five years but that she would not lie for the Petitioner. The Petitioner had arthritis and carpal tunnel syndrome in her wrists. After the victim's death, the Petitioner "bonded out" of jail and stayed with Harris and her family for a couple of weeks. Harris said that the Petitioner could not use a vacuum cleaner for long periods of time because

her hands "were aching like arthritis would" and that the Petitioner "had aches all the time."

On cross-examination, Harris acknowledged that the Petitioner did not make bond until almost one year after the victim's death. The Petitioner did not have a car and did not drive, so Harris' daughter would "take her to the store and stuff." Harris said that the Petitioner did not use a vacuum cleaner at Harris' house but that "I know that it caused problems for her to run the vacuum cleaner for any amount of time she would start aching." Harris acknowledged that the Petitioner took showers by herself and dressed herself. The Petitioner fed herself, could hold a drinking glass, and did not complain of pain when she ate or drank. The Petitioner also folded "a piece or two" of her own laundry. Harris said the Petitioner's health "has not been very good for the last ten or twelve years."

The Petitioner testified that she told trial counsel, "[T]here was no way that I could have held something, done something, you know, with my hands like that, that I couldn't even peel potatoes, or anything like that with my hands." She said that she could not "grasp anything" and that her "repetitiveness is real bad." The Petitioner said she could drive a car short distances, acknowledged that she would hold a can of soda when she was at trial counsel's office, and said that she could eat with a fork.

The Petitioner testified that she used to be a machine operator, which required the repetitive use of her hands. In 1997, she had surgery on each hand for carpal tunnel syndrome because she was having pain, numbness, and tingling in her hands. In 1999, she underwent "revision surgery" on both hands for carpal tunnel. At some point, she broke her right hand, and pins had to be implanted. The Petitioner was right-handed, and trial counsel obtained her medical records because she complained about her hands. She thought counsel was going to use the records at trial to show that she could not have killed the victim.

On cross-examination, the Petitioner acknowledged that in November 2006, she filled out a multi-page questionnaire for the trial court. She acknowledged that she could write but said that she would have to write "a little and then come back to it." She said she could not write for long periods of time because her hand would "cramp up" so that she could not use a pen.

Leslie Whaley, the Petitioner's daughter, testified that at the time of the victim's death, Whaley was "on drugs real bad." She had lost custody of her children, and they were living with the Petitioner. Whaley said that at that time, the Petitioner had problems with "her heart, her hands, her legs, something to do with her veins." The Petitioner had had numerous hand surgeries, and Whaley took care of her by cleaning the house and

cooking. Whaley said that the Petitioner "couldn't do much of nothing that was cleaning-wise" and that the Petitioner "could barely even write." On some days, the Petitioner could not get out of bed because she "hurt so bad." Whaley acknowledged that she loved the Petitioner but said that she was telling the truth.

On cross-examination, Whaley testified that at the time of the victim's death, she was not living with the Petitioner but was at the Petitioner's home every day. Whaley cleaned house and cooked for the Petitioner, and the victim mowed the yard. Whaley acknowledged that the Petitioner had a pool table but said that she had not seen the Petitioner play in many years. The Petitioner could feed and dress herself. However, Whaley helped the Petitioner with buttons and zippers. The Petitioner could brush her hair but could not use her hands to "pull it up" in a ponytail. The Petitioner owned a cellular telephone and was able to use it.

Upon being questioned by the trial court, Whaley testified that the Petitioner owned a car and could drive. She acknowledged that the Petitioner was in a lot of pain and took pain medication. The trial court noted that the only medication listed by the Petitioner on her 2006 questionnaire was Xanax.

Special Agent Chris Bevins of the Tennessee Bureau of Investigation testified for the State that in August 2006, he was an investigator for the Washington County Sheriff's Department. On the day of the victim's death, he interviewed the Petitioner for about five hours. During that time, she signed a waiver of rights form, did not indicate that she had any medical conditions to prevent her from participating in the interview, and drank a cup of coffee. Regarding her interview, Agent Bevins stated that

> in remembering the course of events in the past day she relayed that her and [the victim] and one or the other had mowed the yard and they returned the lawnmower to the owners as well as when they got back to the residence at some point she was downstairs cleaning up dog feces as well as racking pool balls playing pool. So, there was obvious -- in my mind there was -- there was things that she was able to do with her hands that she made no mention in her statement that -- that she was of any -- had any hindrances to do those things.

On cross-examination, Agent Bevins testified that the Petitioner claimed at first that she was racking pool balls but then gave "multiple accounts of what transpired."

The Petitioner testified on rebuttal that she was under the influence of alcohol and Xanax and was in shock during her interview with Agent Bevins. On cross-examination, she testified that she was "passing out" during the interview and that Agent Bevins would scream at her to wake up. She said that she had viewed a video recording of the interview and that "[i]t didn't seem like me." The post-conviction court asked to see the video, and the video was played for the court.[2]

In a written order, the post-conviction court denied the Petitioner's petition for post-conviction relief. The court found the Petitioner not credible, stating that "[t]he court only needs to look to the nine (9) different accounts this Petitioner told law enforcement about this homicide to gauge of her credibility. In doing this, it's obvious that this Petitioner has none." The trial court also found it particularly telling that the Petitioner raised no issue regarding her medical records in her original petition for post-conviction relief. The court acknowledged that someone in prison probably helped the Petitioner draft her petition but found it "strange that Petitioner did not advise whoever was helping her, that she had all these medical issues that [trial counsel] failed to bring out, to show she could not commit this crime[.]" The court also found it telling that during the Petitioner's interview with Chris Bevins, she told him that she was unemployed but did not "say one thing about her medical condition" and never told him that she could not commit the crime because she could not use her hands. The post-conviction court stated, "In other words, it was just as [defense counsel] testified to in this hearing." Finally, the court found that the evidence against the Petitioner was "somewhat overwhelming." The court concluded that trial counsel did not render deficient performance or that the Petitioner was prejudiced by any deficiency.

## II. Analysis

The Petitioner contends that she received the ineffective assistance of counsel because trial counsel failed to present medical evidence that would have shown she was physically incapable of killing the victim. To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-

---

[2] We also have viewed the video, which is two hours in duration. At no time did the Petitioner appear to pass out or Agent Bevins yell at her to wake up.

conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the "petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Generally,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Turning to the instant case, trial counsel testified that he was aware of the Petitioner's carpal tunnel syndrome and obtained her medical records but that she never told him she could not have stabbed the victim. He also asked the medical examiner if a person with carpal tunnel could stab someone thirty times. Counsel stated that if the Petitioner, or anyone else, had told him that she was physically unable to stab the victim, then he would have pursued the issue. The post-conviction court accredited counsel's testimony. Like the trial court, we find it significant that the Petitioner never told Agent Bevins on the day of the crime or the person who helped her draft her original petition that she was physically unable to grasp a knife or stab the victim. We further note that the Petitioner did not present her treating physicians or any expert at the evidentiary

hearing to support her claim.  <u>See</u> <u>Black v. State</u>, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).  Thus, we agree with the post-conviction court that the Petitioner has failed to show that counsel rendered deficient performance or that she was prejudiced by any deficiency.  Accordingly, the court properly denied her petition for post-conviction relief.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE